## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

_____

OCEANA, INC, *et al.*,          )
                              )
          **Plaintiffs,**   )
                              )
        **v.**              )     **Civil Action No.  04-0811 (ESH)**
                              )
DONALD L. EVANS, *et al.*,      )
                              )
          **Defendants.**   )
_____)

### MEMORANDUM OPINION

Plaintiffs allege that the Secretary acted improperly in approving Amendment 13 to the Northeast Multispecies Fishery Management Plan ("FMP"), which governs groundfish fishing in the waters off New England.  This most recent amendment purports to establish a detailed plan for halting overfishing of several stocks and rebuilding them to healthy, sustainable levels. Amendment 13 is being attacked from all sides, with the Trawlers Survival Fund ("TSF"), which represents several groups of fishermen, challenging the Secretary for failing to authorize enough fishing, and Conservation Law Foundation and the Natural Resources Defense Council (collectively "CLF"), challenging the Secretary for not limiting fishing enough.  Similarly, plaintiff Oceana contends that Amendment 13 does not go far enough in protecting groundfish essential fish habitat ("EFH"), such as ocean bottoms vital to juvenile cod development.  All of the plaintiffs also challenge various procedural aspects of the Secretary's decision-making process.  These claims are based on the Magnuson-Stevens Act ("MSA"), the Administrative Procedure Act ("APA"), the National Environmental Policy Act ("NEPA"), and the Regulatory Flexibility Act ("RFA").  The Secretary is joined as defendant by intervenors TSF, the City of

Portland, Maine, and the Associated Fisheries of Maine; and the Cape Cod Commercial Hook Fishermen's Association and hook fisherman Paul M. Parker, all of whom seek to uphold Amendment 13.  The States of Maine and Rhode Island and the Commonwealth of Massachusetts have submitted a brief as *amici curiae.*

On the basis of the parties' pleadings, the hearing held on February 25, 2005, and a voluminous administrative record, the Court grants in part and denies in part plaintiffs' motions for summary judgment, and with exception of the issue of the bycatch reporting methodology and TSF's Count Seven, judgment is entered on behalf of the defendants.

## BACKGROUND

I.     **The Magnuson-Stevens Act ("MSA")**

A.     **Amendment 13**

The statutorily-created New England Fishery Management Council ("Council"), *see* 16 U.S.C. § 1852(a)(1)(A), which had primary responsibility for creating Amendment 13, spent five years designing an FMP that prioritizes protecting New England groundfish[1] while attempting to minimize economic hardship on fishing communities that are invariably affected by fishery management actions.  (A.R. 166 (Amendment 13) at C76.)  Of the twenty stocks of fish (comprising twelve species, some of which are managed separately based upon geography) in the

---

[1]  Groundfish are species that spend most of their lives on or near the ocean floor, and include, *inter alia,* cod, haddock, and yellowtail flounder.  (A.R. 166 at C5.)  *See also NRDC v. NMFS,* 280 F. Supp. 2d 1007, 1009 (N.D. Cal. 2003) (discussing Pacific groundfish).

fishery (*id.* at C5), most were overfished.[2]  (*Id.* at 74)  The Council projected that if measures

were not taken to rehabilitate stocks and end overfishing, the industry could lose up to $200

million over the next two decades as fish stocks dwindled to even more dangerously low levels.

(*Id.*)  The Council acted, therefore, in order to protect the environment, the future of the fish

stocks, and the well-being of commercial and recreational fisheries.  (*Id.* at 74-75.)

The Council developed Amendment 13 pursuant to its authority under the Magnuson-

Stevens Act of 1976, which was established to conserve and manage fishery resources, in large

part through the creation of FMPs and amendments thereto.[3]  *See* 16 U.S.C. § 1801(b)(1); *id.*

§ 1853(a).  Although the MSA gives the Secretary[4] ultimate authority to approve, disapprove, or

partially approve FMPs, *see id.* § 1854(a)(3), councils are the primary bodies charged with

developing FMPs in the first instance, a process that generally involves years of research, the

weighing of various alternatives, and numerous public hearings and opportunities for

---

[2]  Overfishing and overfished mean "a rate or level of fishing mortality that jeopardizes the capacity of a fishery to produce the maximum sustainable yield on a continuing basis."  16 U.S.C. § 1802(29).

[3]  Throughout this Memorandum Opinion, the term "FMP" also includes FMP amendments, such as Amendment 13.  The original FMP and its subsequent incarnations are governed by the same standards.  *See, e.g.*, 16 U.S.C. § 1854(a).

[4]  In practice, the Secretary has delegated his authority to the National Marine Fisheries Service ("NMFS").  *See C & W Fish Co., Inc. v. Fox*, 931 F.2d 1556, 1558 & n.1 (D.C. Cir. 1991).  However, this Memorandum Opinion refers to the Secretary because he is the official charged by statute with adopting (or rejecting) council-proposed FMPs, based on an analysis of whether they "conform[] . . . to the requirements of applicable law."  *See* 16 U.S.C. § 1854(a)(3).  In other words, the Secretary has the final word on each FMP, and a plan does not become effective until he signs off (unless he fails to act within thirty days of receiving the FMP from the council, in which case the plan automatically takes effect).  *Id.*  Therefore, it is Amendment 13 as adopted by the Secretary that is presently before the Court, not any earlier unofficial draft that the Council may have considered.  Amendment 13 was published in the Federal Register as a final rule on April 27, 2004.  69 Fed. Reg. at 22,906.

participation by interested parties.  *See, e.g.*, *id.* § 1852(i)(2).  Only under exceptional

circumstances, such as emergencies or where a council fails to act, may the Secretary bypass the

council process and devise management measures on his own.  *See id.* §§ 1854(c), 1855(c).

The MSA requires a council to produce FMPs that are "consistent with" ten "National

Standards."  *Id.* § 1851(a).  Four of these are particularly relevant to the instant case.  National

Standard One requires that "Conservation and management measures shall prevent overfishing

while achieving, on a continuing basis, the optimum yield from each fishery for the United States

fishing industry."  *Id.* § 1851(a)(1).  National Standard Two establishes that FMPs must be based

on "the best scientific information available."  *Id.* § 1851(a)(2).  National Standard Eight

provides that, "consistent with the conservation requirements of this [Act] (including the

prevention of overfishing and rebuilding of overfished stocks), [FMPs shall] take into account

the importance of fishery resources to fishing communities in order to (A) provide for the

sustained participation of such communities, and (B) to the extent practicable, minimize adverse

economic impacts on such communities."  *Id.* § 1851(a)(8).  Finally, National Standard Nine

requires that FMPs, "to the extent practicable, (A) minimize bycatch[5] and (B) to the extent

bycatch cannot be avoided, minimize the mortality of such bycatch."  *Id.* § 1851(a)(9).

Recognizing that "major changes were needed" to the MSA, in 1996 Congress enacted

the Sustainable Fisheries Act ("SFA") in order to address "the current crisis in . . . groundfish

---

[5] Bycatch is "fish which are harvested in a fishery, but which are not sold or kept for personal use."  16 U.S.C. § 1802(2).  In other words, bycatch refers to fish caught incidentally while fishers are targeting a different species.  "In simple terms, bycatch kills fish that would otherwise contribute toward the well-being of the fishery or the nation's seafood consumption needs."  *CLF v. Evans*, 209 F. Supp. 1, 12 (D.D.C. 2001) (footnote omitted).

stocks, a crisis for the conservation of both fish stocks and fishing families." *See* 142 Cong. Rec. H11418, 11440 (1996) (statement of Rep. Studds). The MSA was thereby amended to include further provisions designed to protect essential fish habitat, expedite planning for ending overfishing, minimize bycatch, and maintain viable fishing communities. *See* 16 U.S.C. §§ 1853(a)(7) (EFH), 1854(e)(3) (one-year deadline for FMPs to end overfishing), 1853(a)(11) (bycatch), 1854(e)(4)(A)(i) (considering needs of fishing communities in ending overfishing and rebuilding stocks); *see also A.M.L. Int'l, Inc. v. Daley*, 107 F. Supp. 2d 90, 94 & n.5 (D. Mass. 2000) (discussing SFA's creation, in response to "the perceived inability of fishery councils to quickly enact needed conservation measures").

### B.      Relevant Past Litigation

Before the parties' arguments can be considered, it is necessary to discuss the prior lawsuits that have attacked earlier amendments and frameworks[6] involving the New England fishery and have thereby helped to shape Amendment 13. In *CLF v. Evans*, two plaintiffs in the instant action -- CLF and Oceana -- challenged the framework governing the Atlantic sea scallop fishery on the grounds that it did not close certain areas that purportedly would have protected EFH and minimized bycatch. 360 F.3d 21, 27-28 (1st Cir. 2004). The First Circuit rejected plaintiffs' claim, holding, *inter alia*, that adverse effects on EFH and bycatch need only be minimized to the extent "practicable." *Id.* (quoting 16 U.S.C. §§ 1851(a)(9), 1853(a)(7), 1853(a)(11)). It also observed that that term "allow[s] for the application of agency expertise and

---

[6] Frameworks are adjustments to FMPs and FMP Amendments that involve abbreviated procedures for revising FMP overfishing definitions, resetting fishing mortality targets, and for other "action[s] [] necessary to meet or be consistent with the goals and objectives of the Northeast Multispecies FMP." 50 C.F.R. § 648.90(b). They may be undertaken "at any time," *id.*, but in practice they were initiated when recalibrating rebuilding goals on an annual basis.

discretion in determining how best to manage fishery resources," and under that standard, the Secretary's plan was not irrational. *Id.* at 28.

Further, Oceana challenged the Secretary's approval of a sea scallop framework on the grounds that it failed to adequately protect endangered sea turtles. But because the framework had been superseded by Amendment 10,[7] the lawsuit was dismissed as moot. *See Oceana, Inc. v. Evans*, 2004 U.S. Dist. LEXIS 14895, at *2, *11 (D. Mass. July 30, 2004). Similarly, a MSA challenge to the Secretary's procedures in adopting Amendment 13 was dismissed as moot in light of a superseding interim rule that corrected the purported flaws identified by plaintiff. *See Associated Fisheries of Me., Inc. v. Evans*, 350 F. Supp. 2d 247, 249, 256-57 (D. Me. 2004).

In *American Oceans Campaign v. Daley*, AOC -- as Oceana was then known -- successfully challenged the sufficiency of the Secretary's assessment of alternatives in promulgating FMP measures designed to protect EFH. 183 F. Supp. 2d 1, 5 (D.D.C. 2000) ("*AOC*"). Although the Honorable Gladys Kessler rejected plaintiff's substantive MSA challenge, the Court agreed with AOC that the Secretary had violated NEPA, 42 U.S.C. § 4321 *et seq.*, by preparing Environmental Assessments ("EAs") that "fail[ed] to consider all relevant and feasible alternatives, and fail[ed] to fully explain the environmental impact of the proposed action and alternatives." 183 F. Supp. 2d at 20. Accordingly, the Court permanently enjoined the relevant FMP amendments until the Secretary "perform[ed] a new, thorough, and legally adequate EA or [Environmental Impact Statement ("EIS")] for each EFH Amendment." *Id.* at 21.

---

[7] Currently pending before this Court is a related case that challenges Amendment 10 to the Atlantic Sea Scallop FMP. *See Oceana, Inc. v. Evans*, No. 04-810 (D.D.C.).

Finally, Judge Kessler also ruled against the Secretary in a challenge to Amendment 13's predecessors brought by CLF, NRDC and others. Plaintiffs contended that the Secretary had breached the MSA by failing to prevent overfishing and to minimize bycatch in New England waters. *CLF v. Evans*, 209 F. Supp. 2d 1, 5 (D.D.C. 2001) ("*CLF I*"). Given defendants' concession that they had not come into compliance with the SFA's overfishing and rebuilding provisions, the Court ruled that defendants had arbitrarily and capriciously breached their duties under the SFA and APA. *Id*. at 9, 10. The Court further rejected defendants' argument that immediate relief was inappropriate because of the upcoming approval of Amendment 13, which at that time was expected in 2003. *Id*. Finally, the Court ruled that the Secretary had breached the SFA and APA by failing to implement any new measures to report and to minimize bycatch and bycatch mortality. *Id.* at 13-15.

Subsequently, Judge Kessler entered a Remedial Order on May 23, 2002 that, by its own terms, expired upon promulgation of Amendment 13. *CLF v. Evans*, 211 F. Supp. 2d 55, 57 (D.D.C. 2002) ("*CLF II*"). The Order, which incorporated a settlement agreement reached by the parties, required the Secretary to adopt regulations complying with the SFA's overfishing, stock rebuilding, and bycatch provisions. The Order further required the Secretary to "provide 5% observer coverage, or higher, if necessary to provide statistically reliable data," in order to measure bycatch. *Id.* at 58. The Court ordered that observer coverage be expanded to 10% as of May 1, 2003, "unless [the Secretary] can establish by the most reliable and current scientific information available that such increase is not necessary." *Id.* On the date the 10% coverage level was to take effect, the Secretary filed a notice with the Court indicating that defendants had concluded, based on a scientific study, that a 5% level was sufficient. Federal Defendants'

Notice of Administrative Action, Ex. 1 at 3, *CLF v. Evans*, No. 00-1134 (D.D.C. May 1, 2003).

Plaintiffs objected on the grounds that the Secretary's scientific justification was insufficient

because it failed to address whether the level of coverage would produce accurate estimates.

Plaintiffs' Response to Federal Defendants' Notice of Administrative Action at 1-2, *CLF v.

Evans*, No. 00-1134 (D.D.C. June 4, 2003).

The parties also entered into a Joint Stipulation in December 2001 to resolve several

issues relating to the Court's ruling in *AOC*. Most significantly, the Secretary agreed that any

future EIS would consider a "range of reasonable alternatives" for protecting EFH. (A.R. 1331 at

D-01-3105-06 ¶ 6.) Among those alternatives were to be "'no action' or status quo alternatives

and alternatives setting forth specific fishery management actions that can be taken by

NMFS . . . ." (*Id.*) The parties agreed that the Court would retain jurisdiction over the case in

order to enforce and interpret the Joint Stipulation. (*Id.* at D-01-3114 ¶ 24.)

In order to comply with the Secretary's statutory duties, as well as the commitments

incorporated in the Remedial Order and the Joint Stipulation, Amendment 13 includes a host of

measures aimed at "rebuilding overfished stocks, ending overfishing, . . . reducing bycatch, and

minimizing the impact of the fishery on fish habitat and protected species." (A.R. 166 at C5.)

The Council established formal rebuilding programs that gradually reduce fishing effort in order

to rebuild most overfished stocks by 2014. (*Id.* at C6.) The Council also designed special access

programs ("SAPs") that allow restricted fishing in certain areas that might otherwise be off-

limits. (*Id.* at C7.) Amendment 13 incorporated the informal United States / Canada Resource

Sharing Understanding ("US/Canada Understanding") into the New England groundfish FMP,

such that certain quotas for species in the eastern Georges Bank would be set in the future by

representatives of both nations.  (*Id.*)  The Council closed several areas to various types of fishing

gear in order to protect EFH.  (*Id.* at C10.)  Amendment 13 also suggested a desired level of

observer coverage aboard fishing vessels in order to monitor bycatch so that it could be more

accurately reported.  (*Id.* at 8.)  The Council created a system for allocating a share of the total

allowable catch (a "TAC" or quota)[8] for certain species to "sectors" of the industry that

voluntarily organize and subject themselves to supplemental regulations.  (*Id.*)  The Amendment

restructured fishers' permitted days-at-sea ("DAS") in order to enable the Secretary to more

effectively control fishing effort.  (*Id.* at C8-9.)  In designing Amendment 13, the Council also

included an EIS that evaluated a host of alternatives to the measures it ultimately proposed.  All

in all, the Council concluded that Amendment 13 would achieve its conservation goals, including

the rebuilding of overfished species, while also providing substantial economic benefits in the

long term to fishing communities, even if sacrifices would be required for the short term.  (*Id.* at

C12, 14.)

### C. Plaintiffs' Claims in the Instant Lawsuit

Amendment 13 as approved by the Secretary has invited a new round of litigation.  First,

CLF attacks Amendment 13 for violating the MSA and the APA by failing to end overfishing

immediately for those stocks that have been depleted the most severely from overfishing.

Plaintiffs contend that the plain language of the MSA obliges the Secretary to take immediate

---

[8] A target TAC was established for each managed stock of groundfish.  *See* 69 Fed. Reg. at 22,915.  These targets are "soft TACs," meaning that they are merely goals; the fishery is never closed under the soft TAC system.  (A.R. 166 at C548.)  By contrast, a hard TAC shuts down the entire fishery for that species when the quota is reached.  (*Id.*)  Amendment 13 did not implement hard TACs on a fishery-wide basis, although they are used in a few subsections of the New England waters.

action to rebuild stocks and to terminate fishing in excess of optimum yield ("OY"). (CLF Mot. at 19-25.) They further attack the Secretary's rebuilding plans as having an unacceptably low probability of success, especially given the past history of failures, in violation of this Circuit's requirement that FMPs must have at least a fifty percent probability of achieving their targets. *See NRDC v. Daley*, 209 F.3d 747, 754 (D.C. Cir. 2000). (CLF Mot. at 27-33.) Additionally, CLF lodges a NEPA challenge to Amendment 13's EIS for its alleged failure to analyze fully the environmental impact of the proposed measures and to consider a suitably broad range of alternatives. (*Id.* at 36-44.)

Second, TSF makes essentially the opposite point from CLF. Identifying several purported procedural deficiencies in the Amendment 13 approval process, this plaintiff contends that the FMP authorizes too little fishing by implementing a plan that differs from that authorized by the Council in violation of the MSA. TSF attacks various measures that have been implemented, arguing that they contravene decisions of the Council. (TSF Mot. at 2-3.) TSF also claims that the version of Amendment 13 approved by the Secretary violates MSA National Standard Eight and the Regulatory Flexibility Act, because the implemented version has more severe economic impacts on fishing communities and is different from the version that the Council used in assessing the financial and social impacts of the proposed measures. (TSF Mot. at 13-14, 42.) TSF further challenges the validity of a regulation promulgated by the Secretary, 50 C.F.R. § 648.85(a)(2)(i)(D), on the grounds that it violates the MSA by allowing the NMFS Regional Administrator to overrule the Council in setting certain fishing quotas. (TSF Mot. at 39-41.)

Third, Oceana contends that the Amendment violates the MSA, the APA and NEPA by failing to adequately consider alternatives for protecting EFH. Plaintiff focuses on the limited range of area closure options the Council considered, arguing that Amendment 13 is deficient because the most protective alternative that was considered was no more protective of EFH than the status quo option that was in place at the time of the *AOC* decision. (Oceana Mot. at 28-33.) Oceana further faults the Amendment for its failure to consider designating Habitat Areas of Particular Concern ("HAPCs"), which are a subset of EFH. *See* 50 C.F.R. § 600.815(a)(8). (Oceana Mot. at 34-36.)

Fourth, both CLF and Oceana argue that, as Judge Kessler previously ruled in *CLF I*, defendants continue to ignore their MSA duty to create an FMP that adequately monitors and minimizes bycatch. Oceana focuses in particular on the Secretary's statement that he "intends" to only implement a 5% observer coverage level, notwithstanding *CLF II's* Remedial Order incorporating a ten percent level from May 1, 2003 forward, and an Oceana-commissioned scientific study which recommends 20% coverage as the minimum adequate level. (Oceana Mot. at 36-40; Oceana Reply at 26-32.) Oceana further attacks Amendment 13's EIS for failing to consider a sufficient range of alternatives in terms of observer coverage. (Oceana Mot. at 40-41; Oceana Reply at 32-34.) CLF challenges Amendment 13 on a more general level for its failure to adopt a coherent, standardized program for reporting bycatch. CLF contends that a few "scattered" and "isolated" references to various methods do not satisfy the MSA's bycatch reporting requirements. (CLF Mot. at 33-36; CLF Reply at 28-30.)

D.        **Defendant-Intervenors and *Amici Curiae***

Given the consequences for the New England groundfish fishery, a host of other

interested parties have intervened as defendants or have submitted a brief as *amici*.  In addition to

the federal defendants, intervenors TSF, Associated Fisheries of Maine, and the City of Portland,

Maine defend the Council's interpretation of the MSA's overfishing and rebuilding provisions.

(TSF Opp'n at 4-12.)  They also basically defend the Council's choice of fishery management

measures (even as plaintiff TSF disputes several alleged modifications made by the Secretary to

the Council's proposals).  (*Id.* at 13-20.)  Their fundamental premise is that the Council

successfully struck a delicate balance with respect to a complex, interdependent ecosystem with

numerous species of groundfish, and this balance reasonably prevents overfishing and provides

for stock rebuilding while protecting, to the extent consistent with attaining these goals, the

livelihood of fishing communities.  (*Id.* at 12, 20-22.)  They also submit that the range of

management measures considered by the Council was reasonable and lawful under NEPA and

the MSA.  (*Id.* at 23-29.)[9]

---

[9]  The Cape Cod Commercial Hook Fishermen's Association and Paul W. Parker
(collectively "CCCHFA") have also intervened as defendants.  They describe Amendment 13's
sector program, which establishes different management measures for groups that voluntarily
organize and subject themselves to special regulations.  As part of the program, defendant-
intervenors are allocated a hard quota of Georges Bank cod as a subset of the overall TAC for
that fishery. (CCCHFA Opp'n at 3, 4-5.)  The sector program  is "in addition to and independent
of the principal management option chosen for Amendment 13." (A.R. 166 at C143.)  CCCHFA
argues that none of CLF's or Oceana's arguments applies to its fishing activities or its share of
the Georges Bank cod fishery.  (CCCHFA Opp'n at 7-10.)  It also contends that most of plaintiff
TSF's arguments are inapplicable to the CCCHFA's activities and the regulations to which it is
subject, although it does not object to TSF's arguments so long as they are consistent with
preventing overfishing.  (*Id.* at 11.)  No party challenges CCCHFA's contentions or objects to the
Amendment 13 sector program.  Nor has the Court identified any legal deficiency involving the
sector program.  Therefore, nothing in this Memorandum Opinion shall be construed to restrict
CCCHFA's activities pursuant to the sector program.

The States of Maine and Rhode Island and the Commonwealth of Massachusetts (collectively "the States") have submitted a joint brief as *amici curiae* that details the adverse economic effects the jurisdictions are expected to suffer as a result of the management techniques instiued by Amendment 13.  (States' Br. at 5-6.)  They warn that further modifications to the Amendment that could result from granting the relief sought by the conservation plaintiffs would have dire consequences for their local fishing communities.  (*Id.* at 5.)  They argue that Amendment 13's plans to end overfishing and to rebuild stocks constitute a "delicate balance" of conservation goals, the minimization of economic harm to the fishing industry, and concerns for the safety of fishers.  (*Id.* at 9.)  They strenuously resist what they perceive as plaintiffs' efforts to tip this balance by prioritizing conservation goals over the other valid interests recognized by the National Standards.  (*Id.* at 9-10.)  The States also argue that the Amendment 13 EIS satisfies NEPA by considering practicable alternatives more protective than the status quo.  (*Id.* at 13-14.)  They further submit that vacatur of Amendment 13 would be an inappropriate remedy, because it is part of "an evolving administrative response to complex and interrelated issues" that should not be rejected wholesale.  (*Id.* at 16.)

## II.     Other Relevant Statutes

### A.     The National Environmental Policy Act ("NEPA")

In addition to the MSA, as amended by the SFA, several other statutes are implicated by plaintiffs' claims.  Chief among these is NEPA, which requires all federal agencies proposing "major Federal actions significantly affecting the quality of the human environment" to examine their environmental effects and inform the public of the environmental considerations involved in agency decisionmaking.  42 U.S.C. § 4332(2)(C).  These disclosures normally take the form of

an EIS.  *See id.*  Essentially a procedural statute, NEPA does not require an agency to reach a

given decision in light of the information it collects and weighs.  *See Robertson v. Methow Valley*

*Citizens Council*, 490 U.S. 332, 350-51 (1989).  Rather, the statute's purposes are to ensure that

the agency considers the environmental effects of its actions and to "guarantee[] that the relevant

information will be made available to the larger audience that may also play a role in both the

decisionmaking process and the implementation of that decision."  *Id.* at 349.

　　　The heart of an EIS is its analysis of a reasonable range of alternatives to the agency's

proposed action.  These alternatives should be presented so as to "sharply defin[e] the issues and

provid[e] a clear basis for choice."  40 C.F.R. § 1502.14.  The range of options considered by the

agency is "bounded by some notion of feasibility," and a "'detailed statement of alternatives'

cannot be found wanting simply because the agency failed to include every alternative device and

thought conceivable by the mind of man."  *Vermont Yankee Nuclear Power Corp. v. NRDC*, 435

U.S. 519, 551 (1978).  Thus, courts apply a "rule of reason" in assessing whether an agency

considered a sufficient range of alternatives.  *See Tongass Conservation Soc'y v. Cheney*, 924

F.2d 1137, 1140 (D.C. Cir. 1991) (internal quotation marks and citation omitted).  Moreover,

"[t]he goals of an action delimit the universe of the action's reasonable alternatives."  *City of*

*Alexandria v. Slater*, 198 F.3d 862, 867 (D.C. Cir. 1999) (quoting *Citizens Against Burlington,*

*Inc. v. Busey*, 938 F.2d 190, 195 (D.C. Cir. 1991)) (internal quotation marks omitted).  Thus, an

agency need not consider options inconsistent with the action's purpose.  *Id.*  Courts accord

"considerable deference to the agency's expertise and policy-making role" that defined the scope

of the action in the first place.  *Id.*  In addition to setting forth alternatives, an EIS must also

analyze an action's direct, indirect and cumulative impacts, detail the action's purpose and need,

and describe the affected environment.  *See* 40 C.F.R. § 1502.1 *et seq*.  A court's role in

evaluating a NEPA challenge is "not [to] substitute its own policy judgment for those of the

agency," *Tongass*, 924 F.2d at 1140, but to "ensure that the agency took account of [the relevant]

factors and that its decision was not arbitrary and capricious."  *Humane Soc'y of the U.S. v.

Hodel*, 840 F.2d 45, 62 (D.C. Cir. 1988).

> **B.      The Regulatory Flexibility Act ("RFA")**

While the plaintiff conservation groups invoke NEPA to support their argument, TSF

looks to the RFA, which is also a procedural statute that requires, *inter alia*, that an agency

analyze a rulemaking's effects on small entities.  *See* 5 U.S.C. §§ 603, 604.  The purpose of such

an analysis, which must be made available for comment, is to ensure that agencies consider the

effects of federal actions on small businesses and that agencies evaluate significant alternatives

that might minimize adverse economic impacts on such businesses.  *Id.* § 604(b).  *See Associated

Fisheries of Me., Inc. v. Daley*, 127 F.3d 104, 114-17 (1st Cir. 1997) ("[RFA] section 604 does

not require that a [Final Regulatory Flexibility Analysis] address every alternative, but only that

it address significant ones.").

> **C.      Administrative Procedure Act ("APA")**

The Court reviews the Secretary's actions pursuant to the judicial review provisions of

the APA.  The Court may set aside an administrative action only where it is arbitrary, capricious

or otherwise unlawful.  *See* 5 U.S.C. § 706(2)(A)-(D).  *See Marsh v. Oregon Natural Res.

Council*, 490 U.S. 360, 375 (1989).  Administrative actions are presumed valid and are accorded

great deference; thus, the inquiry is only whether the Secretary's decisions were unreasonable,

and "this court will not second guess an agency decision or question whether the decision made

was the best one." *C & W Fish Co.*, 931 F.2d at 1565.  This is particularly the case when the

Court is evaluating the Secretary's scientific determinations, as opposed to simple findings of

fact.  *See Baltimore Gas & Elec. Co. v. NRDC*, 462 U.S. 87, 103 (1983).  Moreover, the Court

will not lightly depart from regulations promulgated by an agency in order to achieve a statute's

goals.  *See Continental Air Lines, Inc. v. Dep't of Transp.*, 843 F.2d 1444, 1451-52 (D.C. Cir.

1988).  Thus, it is "especially appropriate for the Court to defer to the expertise and experience of

those individuals and entities -- the Secretary, the Councils, and their advisors -- whom the

[Mangunon-Stevens] Act charges with making difficult policy judgments and choosing

appropriate conservation and management measures based on their evaluations of the relevant

quantitative and qualitative factors." *National Fisheries Institute v. Mosbacher*, 732 F. Supp.

210, 223 (D.D.C. 1990).

In sum, although this Court undertakes a "searching and careful," *Marsh*, 490 U.S. at 378,

examination to determine whether there is a "rational connection between the facts found and the

choice made," *Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156, 168 (1962), and it

will not accept a record based on "bare conclusory allegations of fact," *Taylor v. FDIC*, 132 F.3d

753, 762 (D.C. Cir. 1997), the Court will likewise not substitute its judgment for that of the

Secretary.  *See Marsh*, 490 U.S. at 378.


## LEGAL ANALYSIS

In addressing the plaintiffs' arguments, the Court has considered the administrative

record, which consists of over eighty volumes of documents, including Amendment 13, which

alone comprises three of these volumes and some eighteen hundred pages, as well as some four

hundred pages of pleadings and the arguments of counsel.  It has also, consistent with the

requirements of the MSA, 16 U.S.C. § 1855(f)(4), attempted to expedite this matter so as to rule

before the fishing season begins on May 1, 2005.  This having been said, the Court will now turn

its attention to the parties' legal arguments.  First, in Section I(B), the Court will focus on CLF's

claim that Amendment 13 violates the law by not properly addressing the problem of overfishing

in the New England groundfish fishery.  In Section I(C), TSF's procedural attacks on

Amendment 13's fishery management program will be considered.  In Section II, the Court will

address Oceana's NEPA challenge to the range of alternatives considered by the defendants when

designing measures to protect EFH.  Finally, CLF's and Oceana's arguments regarding the

adequacy of Amendment 13's methodology for reporting and minimizing bycatch and bycatch

mortality will be discussed in Section III.

## I.       Overfishing

### A.       Background

The gravamen of CLF's claims relates to the ongoing overfishing that is occurring,

especially with respect to certain species (*e.g.*, the Georges Bank cod) and the lack of a

meaningful program for rebuilding the fishery.

As is clear under the MSA, as amended by the SFA, the chief purpose of the statute is to

prevent overfishing and to achieve optimum yield on a continuing basis.  16 U.S.C. § 1851(a)(1).

To accomplish this goal, the statute requires a council to prepare an FMP to "end overfishing in

the fishery and to rebuild affected stocks of fish" within one year after the Secretary determines

that a fishery is overfished. 16 U.S.C. § 1854(e)(3)(A).  Such a plan must end overfishing as

quickly as possible, "taking into account the status and biology of any overfished stocks of fish,

the needs of fishing communities, recommendations by international organizations in which the United States participates, and the interaction of the overfished stock of fish within the marine ecosystem." *Id.* § 1854(e)(4)(A)(i).

As with all FMPs, plans to end overfishing must be consistent with the ten National Standards.  CLF stresses two of these.  National Standard One requires that fishery management measures prevent overfishing while providing OY on a continuing basis from each fishery.  *Id.* § 1851(a)(1).  National Standard Eight states that "Conservation and management measures shall, consistent with the conservation requirements of this chapter (including the prevention of overfishing and rebuilding of overfished stocks), take into account the importance of fishery resources to fishing communities in order to (A) provide for the sustained participation of such communities, and (B) to the extent practicable, minimize adverse economic impacts on such communities." *Id.* § 1851(a)(8).  Although conservation interests must predominate, where two plans achieve similar conservation results, the alternative that minimizes hardship on fishing communities is preferred.  *NRDC v. Daley*, 209 F.3d at 753 (quoting 50 C.F.R. § 600.345(b)(1)).

Three years ago plaintiffs challenged Amendment 13's predecessor.  The Secretary conceded that the FMP he was implementing did not contain an adequate rebuilding program, and in view of this concession, Judge Kessler found that defendants had violated the MSA and the APA.  *CLF I*, 209 F. Supp. 2d at 7-9.  Defendants further acknowledged that the FMP relied on measures that were likely to fail -- for some species, there was only a 1% chance of success -- and the Court therefore rejected the plan as falling below the required 50% probability of success standard.  *Id.* at 10 (citing *NRDC v. Daley*, 209 F.3d at 754).  The Council also admitted that it did not want to comply with NEPA by compiling an EIS that adequately analyzed alternative

management measures for preventing overfishing, and this motivated the administrative decision to adopt a plan that violated the MSA. *Id.* The Court therefore entered a Remedial Order requiring defendants to produce an FMP that established a plan for rebuilding overfished stocks. *CLF II*, 211 F. Supp. 2d at 58. In the *AOC* Joint Stipulation, defendants further committed themselves to producing a proper EIS (A.R. 1331 at D-01-3105) and a lawful FMP according to an agreed-upon timetable. (*Id.* at D-01-3110.)

Amendment 13 is the product of those commitments. The Council and Secretary have now adopted a plan that includes a lengthy EIS and establishes a detailed rebuilding program that purports to have at least a 50% chance of success for each of the twelve overfished species. When developing this plan, the Council evaluated three basic approaches for returning the species to a sustainable level; each approach is pegged to an annual, species-specific fishing mortality rate, which is referred to as "F" (*i.e.*, the rate at which fish may be harvested by humans, whether the fish are kept or discarded). *See North Carolina Fisheries Ass'n, Inc. v. Evans*, 152 F. Supp. 2d 870, 872 n.1 (E.D. Va. 2001). (A.R. 166 at C117.) In the first approach, the F rate is kept constant throughout the rebuilding period, resulting in a steep drop in the level of fishing for that species in the first year the plan is in effect. (*Id.* at C103.) This dramatic upfront decrease was expected to have severe economic consequences for fishing communities, leaving many fishers out of work. *See* 69 Fed. Reg. at 22,920. (*See also* A.R. 166 at C14.)

The second and third approaches are similar in that they both reduce F rates during the course of the rebuilding effort. In the "adaptive rebuilding strategy," the rate is initially dropped to the rate that would produce the maximum sustainable yield ("Fmsy"). (*Id.* at C107.) In 2009, once more data has been gathered about the species' rebuilding potential, the rate is dropped

further to a rate estimated to allow the species to recover from an overfished state during the plan's remaining years.  (*Id.*)  The third approach phases in F reductions throughout the duration of the plan.  Initially, fishing effort remains at a level in excess of Fmsy, but within two to five years, each species' F target reaches Fmsy, and in later years, the "phased" rate falls even further than it would under the adaptive approach in order to allow for rebuilding targets to be met according to the established timetable.  Thus, the phased approach delays instituting extreme decreases in F until a later point in the rebuilding program.  (*Id.* at C104-05, C117.)  But both approaches avoid the steep initial decline in fishing that accompanies the constant F approach, thereby enabling more fishermen to remain in business while stocks rebuild.  (*Id.* at C14.)  These approaches are designed to better account for "[t]he complexity of the fishery and the co-occurrence of stocks of concern and stocks that are not overfished," because even lower F rates for overfished stocks, such as those produced by the constant approach, would also reduce fishers' ability to target abundant stocks in the same geographic area due to the need to avoid bycatch of the overfished stocks.  69 Fed. Reg. at 22,920.  Ultimately, the Secretary adopted the phased approach for five species and the adaptive approach for seven; he did not implement the constant F model.  (*Id.* at C105, C110.)

In order to achieve the F targets for each year, Amendment 13 also implements a variety of direct and indirect management tools.[10]  These include creating per-day and per-trip limits on fish by weight; instituting rolling closures of fishing areas and closing others year-round;

───────────────

[10]  Direct management tools are those that directly limit fishing, such as fixed quotas. Indirect tools are those that seek to control fishing mortality by regulating how fishing is carried out, based on the premise that the greater the restrictions (such as increased mesh size), the fewer fish will be caught.  (CLF Mot. at 9-10.)

instituting minimum fish sizes; limiting vessels' days-at-sea; creating special access programs; establishing quotas or TACs; and modifying fishing gear, such as by increasing mesh size and restricting the use of gillnets.  (*Id.* at C9.)

**B.     CLF's Claims**

CLF raises several challenges pertaining to ongoing overfishing in the New England groundfish fishery.  First, it faults Amendment 13 for allowing continued overfishing in violation of the MSA.  Second, it contends that Amendment 13 must be rejected because the "management measures . . . are unlikely to limit fishing mortality to the target level."  (CLF Mot. at 2.)  Third, it argues that the Secretary failed to adequately assess the problem of overfishing and consider alternative solutions to the problem.  (*Id.* at 36.)  These flaws, it insists, are violations of the MSA, the APA, and NEPA.  These arguments will be considered *seriatim*.

**1.     Is It Lawful for the F Rate to Exceed Fmsy?**

Plaintiffs argue that the Secretary acted unlawfully by authorizing the phased program, which temporarily allows continued overfishing for five species.  They submit that the MSA requires overfishing to be ended immediately, not a few years into a rebuilding program.  (CLF Mot. at 20.)  In particular, plaintiffs argue that Amendment 13 violates the MSA by unlawfully authorizing fishing mortality (F) to exceed Fmsy for five groundfish stocks (*i.e.*, American plaice, Southern New England/Mid-Atlantic yellowtail flounder, Georges Bank cod, Cape Cod/Gulf of Maine yellowtail flounder, and white hake).  69 Fed. Reg. at 22,920-21.

**a.  Applicable law and technical concepts**

The parties' arguments rely on a variety of technical concepts that must be explicated. Some are defined by statute, others by regulation, and others are explained in Amendment 13.

The concepts can generally be divided into two distinct, but related, groups:  those that prescribe *rates* and those that prescribe *amounts* of fish that may be harvested (as measured by weight).

The only relevant terms defined by statute or regulation involve caps on the *amount* of fish that may be caught.  As provided by National Standard One, "Conservation and management measures shall prevent overfishing while achieving, on a continuing basis, the optimum yield from each fishery for the United States fishing industry."  16 U.S.C. § 1851(a)(1).  The MSA defines overfishing as "a rate or level of fishing mortality [F] that jeopardizes the capacity of a fishery to produce the maximum sustainable yield on a continuing basis."  16 U.S.C. § 1802(29).  "Maximum sustainable yield" ("MSY") is a "theoretical concept," 50 C.F.R. § 600.310(c)(2)(i), meaning the amount that is "the largest long-term average catch or yield that can be taken from a stock or stock complex under prevailing ecological and environmental conditions."  *Id.* § 600.310(c)(1)(i).  MSY is the absolute limit on how much fish, as defined in terms of weight, may be harvested.  *See A.M.L. Int'l*, 107 F. Supp. 2d at 94 n.6, 99; 50 C.F.R. §§ 600.310(c), 600.310(f)(4)(ii).  (*See also* TSF Opp'n at 7-8 & n.6.)

Optimum yield, as used in National Standard One, is the amount of fish that:

(A) will provide the greatest overall benefit to the Nation, particularly with respect to food production and recreational opportunities, and taking into account the protection of marine ecosystems;

(B) is prescribed as such on the basis of the maximum sustainable yield from the fishery, as reduced by any relevant economic, social, or ecological factor; and

(C) in the case of an overfished fishery, provides for rebuilding to a level consistent with producing the maximum sustainable yield in such fishery.

*Id.* § 1802(28).  Because OY need only produce MSY "on a continuing basis," *id.* § 1802(29), it "is a standard that should be achieved over the long-run, not necessarily a standard that must be achieved with precision each year."  *Blue Water Fisherman's Ass'n v. Mineta*, 122 F. Supp. 2d

150, 161 (D.D.C. 2000); *accord NRDC v. NMFS*, 280 F. Supp. 2d at 1016. In other words, the maximum OY possible equals MSY, but in many cases it will be set lower on account of social, economic or ecological factors. *See C&W Fish Co.*, 931 F.2d at 1563; 50 C.F.R. § 600.310(f)(4)(ii). And assuming OY is set below MSY, if a plan provides for the amount of fish caught to exceed OY, there is no problem, so long as over time OY is obtained on average and MSY is never exceeded. 50 C.F.R. § 600.310(f)(1)(ii).

The remaining concepts deal with rates (as opposed to amounts of fish) and are defined not by statute, but in the context of Amendment 13. "Fmsy" is the rate of fishing mortality associated with actively building stocks to levels of abundance that the Secretary determines will produce MSY catch amounts over the long run. (*See* A.R. 166 at C1162 (defining Fmsy as the "fishing mortality rate that would produce MSY when the stock biomass is sufficient for producing MSY on a continuing basis [*i.e.*, no longer overfished]").)

The Spawning Stock Biomass rate ("SSBmsy"), also called the biomass rebuilding trajectory, constitutes the rebuilding target for an overfished species. Spawning stock biomass is the "total weight of fish in a stock that sexually mature, *i.e.*, are old enough to reproduce." (A.R. 166 at C1167.) SSBmsy is that portion of spawning stock biomass "that would produce MSY when fished at a fishing mortality rate equal to Fmsy." (*Id.* at C1159.) In practice, the Secretary has moved to using biomass targets in lieu of F targets for rebuilding purposes. *See North Carolina Fisheries*, 152 F. Supp. 2d at 874; *A.M.L.*, 107 F. Supp. 2d at 98. "[A] 'biomass' target is achieved by estimating the total mass of a fishery, and arriving at a suitable harvest level that allows the fishery to maintain its maximum sustainable yield. . . . The ideal biomass . . . is considered to be the biomass that provides maximum sustainable yield, or MSY, from the stock."

*North Carolina Fisheries*, 152 F. Supp. 2d at 873 n.2.  Similarly, Bmsy is the F target rate for

when the stock has been rebuilt to its long-term biomass target.

As should be clear from this discussion, the MSA and its implementing regulations

establish the central importance and relative roles of the different weight caps when designing

measures to address overfishing, but Congress has left the critical task of defining fishing *rates* to

the Secretary and the Council.  CLF nonetheless challenges defendants' rebuilding program by

contending that defendants have violated the law by permitting the fishing mortality rate (F) to

exceed Fmsy with respect to five stocks in the early years of the rebuilding trajectory.

             **b.**      **Statutory construction**

Plaintiffs' argument that the Secretary has violated the MSA by allowing overfishing to

continue for a limited number of years on the front end for the five species managed under the

"phased" approach rests on a misconstruction of the statute.  CLF confuses the statutory bar on

exceeding the MSY *amount* with a nonexistent prohibition on exceeding the Fmsy *rate* during a

rebuilding program.  In fact, the plain language of the statute makes clear that overfishing need

not be ended instantaneously, and given this statutory framework, the Court cannot conclude that

a phased approach that permits overfishing in the early years contravenes the MSA.  Rather, so

long as OY is achieved over time and rebuilding targets can be met within the statutory period,

the Secretary enjoys significant latitude in designing a rebuilding program and in ending

overfishing.

Where Congress has "directly spoken to the precise question at issue," the Court "must

give effect to the unambiguously expressed intent of Congress."  *Chevron U.S.A., Inc. v. NRDC*,

467 U.S. 837, 842-43 (1984).  Here, the statute clearly states that any rebuilding plan shall

"specify a time period for ending overfishing."  16 U.S.C. § 1854(e)(4)(A).  This language would

be superfluous if plaintiffs' instantaneity argument that F may never exceed Fmsy during the

rebuilding plan were correct.  "It is, of course, a 'cardinal principle of statutory construction that

a statute ought, upon the whole, to be so construed that, if it can be prevented, no clause,

sentence, or word shall be superfluous, void, or insignificant.'"  *See United States ex rel. Totten

v. Bombardier Corp.*, 380 F.3d 488, 499 (D.C. Cir. 2004) (citations omitted).  Applying

*Chevron's* Step One analysis, it is clear that Congress provided that overfishing could continue

for a time, and thus, the phase-in approach is not statutorily barred.

Furthermore, it was permissible for the Secretary to take into account "the needs of

fishing communities" in establishing the rebuilding framework and in setting the timetable for

ending overfishing.  *See* 16 U.S.C. § 1854(e)(4)(A)(1).  National Standard One, which prioritizes

conservation measures, *see* 16 U.S.C. § 1851(a)(1), must be read *in pari materia* with the

rebuilding requirements of § 1854(e)(4), which dictate that these economic considerations be

considered when establishing plans for ending overfishing.[11]  Moreover, insofar as various plans

achieve similar conservation results, the approach least economically disadvantageous for

fishing communities is the preferable alternative.  50 C.F.R. § 600.345(b)(1).  Congress' explicit

---

[11]  This holds true for rebuilding plans of ten years or less, as well as for those that run
longer.  The provision dictating that fishing communities' needs be considered requires only that
overfishing be ended in as short a time as possible.  *See* 16 U.S.C. § 1854(e)(4)(A).  The
Secretary has interpreted the statute to allow for such economic considerations to extend the
rebuilding period only up to ten years, unless one of the three exceptions in § 1854(e)(4)(B)
applies, in which case fishers' needs may be considered and may warrant extending the
rebuilding time period up to "the rebuilding period calculated in the absence of fishing mortality
plus one mean generation time or equivalent period based on the species' life-history
characteristics."  50 C.F.R. § 600.310(e)(4)(B); *see NRDC v. NMFS*, 280 F. Supp. 2d at 1014;
*Nat'l Audubon Soc'y v. Evans*, No. 99-1707, 2003 WL 23147552, at *7 (D.D.C. July 3, 2003).

requirement that the Secretary consider the welfare of fishing communities when prescribing measures to end overfishing is consistent with this principle.

In the alternative, even assuming that Congress did not speak clearly on this question, the result does not differ under *Chevron's* Step Two analysis. Where a "statute is silent or ambiguous with respect to the specific issue," the Court must determine whether the Secretary's construction of the statute is permissible. *Chevron*, 467 U.S. at 843. Here, "any ensuing regulation is binding in the courts unless procedurally defective, arbitrary or capricious in substance, or manifestly contrary to the statute." *United States v. Mead Corp.*, 533 U.S. 218, 226 (2001) (citing *United States v. Morton*, 467 U.S. 822, 834 (1984); 5 U.S.C. §§ 706(2)(A), (D)).

The Secretary's interpretation is both reasonable and entitled to deference because it is "consistent with the statutory scheme and legislative history." *City of Cleveland v. U.S. Nuclear Regulatory Comm'n*, 68 F.3d 1361, 1367 (D.C. Cir. 1995). Congress clearly intended to protect endangered fisheries while simultaneously minimizing economic harm to fishing communities. The overfishing measures were to preserve "the long-term sustainability of both the resource and the fishers harvesting the resource." 142 Cong. Rec. S10794, 10816 (1996) (statement of Sen. Murray); *see also id.* at 10825 (statement of Sen. Snowe) ("Given the state of many of our fisheries, we cannot avoid conservation measures. But in the course of developing these measures, it is also equally important that the Federal Government consider the economic costs of fisheries conservation."). The Secretary's construction of the statute, *i.e.*, "the ending of overfishing can be achieved at any time during the prescribed rebuilding schedule, as long as the

ability to rebuild is not jeopardized," is thus reasonable, particularly in light of the need to avoid "severe economic consequences."  *See* 69 Fed. Reg. at 22,920.[12/]

Plaintiffs nonetheless argue that F can never exceed Fmsy during a rebuilding program for an overfished stock, including at the beginning of the rebuilding period in the phased approach.  (CLF Mot. at 20.)   For this proposition, they rely principally on Judge Kessler's decision in *CLF I*, where she stated in a footnote that "[f]or stocks at Bmsy or above, the fishing mortality rate may not exceed the fishing mortality rate which produces the maximum sustainable yield (Fmsy).  *See* [16 U.S.C. § 1802(28)(B)].  For stocks below Bmsy, the fishing mortality rate will be lower than Fmsy so that the stock may rebuild within a specified time frame, typically five or ten years."  209 F. Supp. 2d at 8 n.9.  (CLF Mot. at 21.)  As acknowledged by plaintiffs (*see* Hearing Transcript at 9), this statement is merely *dicta,* and it is not binding here.   In *CLF I*, there was no rebuilding plan to implement, and therefore, that case did not assess whether such a plan complied with the MSA.  In short, the Court's footnote was not germane to the issues before it.

Moreover, it appears that *CLF I* read into the MSA a requirement for a rebuilding plan to achieve Fmsy in year one, whereas in the statutory provision cited in the footnote, there is no reference to fishing mortality rates.  Rather, the Act refers only to terms measuring amounts by weight, *i.e.*, OY and MSY.  *See* 16 U.S.C. § 1802(28)(B).  As already established, Fmsy and MSY are distinct concepts, and the statute refers only to the latter.  And Amendment 13, in point

_____

[12/]  In this regard, it is significant that the Council found that by ending the rebuilding period for certain species at 2014, instead of 2009, the economic benefits to the fishermen and their communities increased by $40 million.  (A.R. 166 at C102.)

of fact, does not permit any harvesting in excess of MSY. (*Compare* A.R. 166 at C94 *with* 69

Fed. Reg. at 22,915.)

   The unsupported conflating of the statutory MSY cap on harvesting by weight with a non-

existent prohibition on fishing in excess of the Fmsy rate appears to underlie the flaw in

plaintiffs' argument.  (*See* CLF Mot. at 19-26; *see also* TSF Opp'n at 6-11.)  Plaintiffs attack the

Secretary's interpretation of the statute, contending that MSY itself, as defined in the Code of

Federal Regulations, is calculated subject to a rate, and therefore that underlying rate is

incorporated into the MSA.  (*See* CLF Reply at 17 ("A Fmsy 'rate' is simply the amount of fish

that can be harvested per unit of time.  In prohibiting fish harvests in excess of maximum

sustainable yield, Congress plainly intended to limit harvests over some period of time.").)

Insofar as CLF argues that the statute itself contains no definition of MSY, and that the

Secretary's regulations define MSY relative to an "MSY control rule," *see* 50 C.F.R.

§ 600.310(c)(2)(i) (*see also* CLF Reply at 17-18), this regulatory definition does not change the

fact that MSY, as that term is used in the MSA, is an amount and *not* a rate.  *See* 16 U.S.C.

§ 1802(28) (using the term "yield" to refer to "the amount of fish").  While it is true that some

formula is used to generate MSY, the cited regulatory language does not and could not render the

formula itself a part of the statutory definition of OY in the overfishing context.  *See id*.

   Moreover, plaintiffs' argument hinges on the notion that an F rate for a given year can

never exceed Fmsy, but as plaintiffs' own definition of that latter rate acknowledges, Fmsy is

computed based upon a "unit of time."  This ambiguous phrasing implicitly recognizes that in the

case of Fmsy for a rebuilding program, that unit of time may be many years, whereas F rates

apply only to one fishing year.  There is no necessary inconsistency with having an F rate for any

given year exceed an Fmsy rate that aims to achieve a given result over the rebuilding trajectory, which may last many years.  In short, Fmsy is not, contrary to CLF's argument,  a statutory baseline; rather, the MSY harvest amount is the cap established by statute.

And the Council has substantial discretion in estimating the MSY cap and OY target for any given stock.  *See* 50 C.F.R. § 600.310(c)(2)(ii) ("Councils have a reasonable degree of latitude in determining which estimates to use and how the estimates are to be expressed."). Since the legality of the actual MSY figures by weight that were adopted by Amendment 13 is not at issue,[13] plaintiffs' challenge to the Amendment 13 timetable for ending overfishing must fail, because their challenge relies on the faulty premise that the MSA applies to the Fmsy rate, when in fact it applies only to the MSY amounts.

Other courts have come to the same conclusion that the MSA applies to rebuilding targets and harvest levels set by weight, not to fishing mortality rates.  For instance, in *NRDC v. NMFS*, the court held that allowing *increased* harvest levels (rising from 130 metric tons ("mt") to 168 mt) for darkblotched rockfish as a result of a scientific finding that the stock was *more overfished* than originally thought, while seemingly counterintuitive, was a reasonable construction of the SFA.  280 F. Supp. 2d at 1013-14.[14]  Similarly, in *North Carolina Fisheries Association, Inc. v.*

---

[13] For instance, CLF provides as examples, but does not challenge, the Fmsy rates adopted by Amendment 13 for various stocks.  (CLF Mot. at 20 n.13.)  Although these examples reflect CLF's confusion as to what figures are legally relevant for purposes of the MSA in that they are rates rather than amounts by weight, they nonetheless demonstrate that CLF is mounting a legal challenge to the Secretary's construction of the statute, rather than contesting the actual figures adopted by Amendment 13.

[14] As explained by the court:

> Plaintiffs contend that NMFS violated the MSA by increasing the
> annual harvest limit for the darkblotched rockfish in the face of

*Evans*, the court endorsed the Secretary's use of rebuilding targets established by weight, as opposed to F rates.  152 F. Supp. 2d at 873-74 & n.2, 880 ("The Court is in no way criticizing the NMFS for adopting the biomass target -- this approach appears far less confusing and thus much more approachable than the older F standard.")

Courts have also rejected challenges to FMPs on the basis that they did not immediately achieve Fmsy.  For instance, in *National Audubon Society v. Evans*, the Secretary had established a twenty-year rebuilding period for Atlantic bluefin tuna that included an annual TAC of 2,500 mt.  2003 WL 23147552, at *2.  In the FMP's early years, the fishery's F rate would be relatively high, but would drop in later years; the Secretary chose this approach, which used a constant TAC amount by weight rather than a constant F rate, because he determined it would be easier and less expensive to administer than the alternative approaches while nonetheless achieving maximum sustainable yield biomass target within the rebuilding time period.  *Id.* at *8.  The

---

evidence that the rockfish was scarcer than originally thought.  While this decision may appear at first blush to be irreconcilable with the agency's duty to prevent overfishing and rebuild overfished stocks, the explanation for the increased limit lies in the effect of the population correction on the length of the rockfish rebuilding plan.

\*   \*   \*   \*

Faced with a choice between an interpretation of the SFA that requires a moratorium on harvesting of fish species that take more than ten years to regenerate naturally, and an interpretation that permits limited harvesting over the course of a longer rebuilding period, NMFS selected -- after public notice and comment -- the latter interpretation. In light of MSA's dual conservationist and commercial objectives, an interpretation that accommodates both objectives, rather than selecting one to the exclusion of the other, is permissible.

*Id.*

Court upheld the Secretary's plan under the MSA and APA. *Id.* at *9.  Plaintiff had also argued that the plan violated National Standard One,  16 U.S.C. § 1851(a)(1), because the fishery's F rate exceeded Fmsy, but the Court rejected this challenge, finding that the plaintiff had failed to present any substantial evidence to support this claim.  *Id.* at 8 n.10.

The Secretary may therefore allow overfishing for a time in order to take account of fishing communities' needs, so long as, *inter alia*, the MSA's conservation goals are achieved and the MSY amount by weight is never exceeded and OY is achieved on average.  It necessarily follows that the phased approach adopted by Amendment 13, which puts off for several years the greatest economic impact on fishing communities, is a proper means of achieving the conservation goal of ending overfishing and rebuilding stocks while simultaneously minimizing economic harm to fishermen and harvesting OY from other stocks.  As explained in Amendment 13, "[g]iven the multispecies nature of the fishery, further reductions [beyond those adopted under the phased and adaptive approaches] for stocks such as [Georges Bank] cod or [Gulf of Maine] cod would result in further reducing catches for stocks that do not need reductions (e.g. [Georges Bank] haddock, [Gulf of Maine] haddock, [Georges Bank] yellowtail flounder).  Given that the goal of the [Magnuson-Stevens] Act remains achieving OY, the Council believes its selection of rebuilding trajectories is more consistent with this goal."  (A.R. 166 at C104.)

In other words, further cutbacks in the phased F rate -- such as an immediate reduction to the Fmsy rate -- would mean in the case of Georges Bank cod, for instance, that haddock fishing in Georges Bank would also have to be cut back in order to avoid cod bycatch, even though haddock are relatively abundant there.  Thus, a cod cutback would significantly hurt fishermen by reducing their ability to fish for another species that can withstand a heavier degree of fishing.

Moreover, conservation objectives are not compromised under the phased approach, for the F rate for cod will indeed fall later to a level lower than it otherwise would have been set at under the constant F approach, thereby allowing the rebuilding goals to be achieved on the same timetable they otherwise would have been.

This example of the interplay between Georges Bank cod and haddock fishing also highlights the delicate and nuanced balance the Council had to strike in Amendment 13 between its duties to maximize OY among all managed species while rebuilding overfished stocks and to concurrently minimize harm to fishing communities.  (*See* States' Br. at 9.)  It was clearly within the Secretary's discretion to choose the plan that achieves the same conservation result while keeping fishers in business, even if that approach temporarily leaves F set in excess of Fmsy.

The Court therefore concludes that it must defer to the Secretary's decision that the phased alternative is reasonable and that overfishing need not be immediately terminated.  *See Mead*, 533 U.S. at 226.

### 2. Does Amendment 13 Have a 50% Probability of Achieving Target Mortality Rates?

CLF next argues that the rebuilding plan for overfished stocks must be rejected because defendants have not established that it has at least a 50% chance of success.  (CLF Mot. at 27.)  In *NRDC v. Daley*, this Circuit held that the Secretary unlawfully adopted a fishery measure he conceded had only an 18% chance of success, even though he considered alternatives that had a greater chance of success.  *See* 209 F.3d at 754.  The Circuit held that a lawful FMP must have at least a 50% chance of success.  *Id.*

CLF challenges a number of specific aspects of Amendment 13 in order to show that its various components are not at least 50% likely to succeed.  As a preliminary matter, defendants contend that all of Amendment 13 meets this threshold.  *See, e.g.*, 69 Fed. Reg. at 22,934. Although an "agency may not rely on mere conclusory statements to explain its decision," *CLF I*, 209 F. Supp.2d at 8, as the following discussion elucidates, the Secretary had a rational basis for making these assertions based on the available scientific evidence.

Plaintiffs first attack the Closed Area Model ("CAM") used by the Council to assess the effectiveness of the management measures adopted in Amendment 13 for achieving the target fishing mortality rates.  They argue that, because there is no established degree of certainty associated with the CAM, none of the measures its findings support can be assured of at least a 50% probability of success.  (CLF Mot. at 27-28.)  To support this argument, plaintiffs seize upon the Secretary's own admissions in Amendment 13 that the model was not completely infallible.  *See* 69 Fed. Reg. at 22,926.  (*See also* A.R. 166 at C294.)

However, the fact that a given model has some imperfections does not prevent it from constituting the "best scientific information available."  16 U.S.C. § 1851(a)(2).  CLF, by failing to offer an alternative for evaluating the management measures, cannot show that CAM was not the best scientific evidence available.  "When examining this kind of scientific determination, as opposed to [an agency's] simple findings of fact, a reviewing court must generally be at its most deferential."  *Baltimore Gas*, 462 U.S. at 103.  *Accord AOC*, 183 F. Supp. 2d at 11-12.  The focus here is on what evidence is *available*; the Secretary cannot fail to design measures to meet his MSA obligations simply because the underlying science is not yet sufficiently sophisticated. *See NRDC v. Evans*, 254 F. Supp. 2d 434, 440 (S.D.N.Y. 2003).  Rather, when the only available

methodology is less than perfect, deference to an agency's expertise is warranted.  *See CLF v. Mineta*, 131 F. Supp. 2d 19, 28 n.20 (D.D.C. 2001) ("It is simply not the Court's role to interject itself into this extremely technical scientific debate; indeed, this is precisely the type of issue in which the Court should properly defer to Defendants' expertise.")  Thus, where there is only an imperfect model to rely upon, the Secretary can reasonably use it as the best available scientific means for evaluating the proposed solutions.

Moreover, the Court will only reject the Secretary's choice of model "when the model bears no rational relationship to the characteristics of the data to which it was applied."  *National Wildlife Fed'n v. EPA*, 286 F.3d 554, 565 (D.C. Cir. 2002) (citations and internal quotation marks omitted).  Here, the CAM was intended to measure only three of the various management measures that were adopted in Amendment 13:  area closures, DAS restrictions, and trip limits (*i.e.*, quotas on the amount of fish a vessel may catch per trip).  (A.R. 166 at C293-94.)  And indeed, the CAM -- within the parameters the Secretary set for it -- fulfilled its purpose, predicting that the combination of these three tools would achieve the desired F rates for all but one species in the FMP's first year of implementation (*i.e.*, 2004).  69 Fed. Reg. at 22,927. Moreover, it predicted that the remaining species -- witch flounder -- would achieve its target F rate by 2006.  *Id.*

Indeed, there are various assumptions implicit in the CAM that may lead it to *underestimate* the effectiveness of the three studied tools:  for example, some of its projections assume that ninety-five percent of DAS will be used (*see* A.R. 166 at C398 (discussing Gulf of Maine cod)), when in fact in the 2004 fishing year vessels are on track to use less than 40% of their DAS.  *See* NMFS-Fishery Statistics Office, Cumulative

DAS Usage by Month for Multispecies Limited Access Vessels, *available at*
http://www.nero.noaa.gov/ro/fso/muldas04b.pdf (last visited Mar. 6, 2005).  Similarly, with
respect to the fishing mortality rate (Fmsy) for Gulf of Maine cod, the CAM did not account for
the mesh size increases required by Amendment 13.  (A.R. 166 at C398.)  Thus, the model's
admitted imperfections could lead to the opposite result from that predicted by plaintiffs:  the
measures adopted based upon the CAM may prove *more* effective than predicted by the model.

Notwithstanding the CAM's usefulness as the best available science for studying the
effects of the three tools it modeled, the Council acknowledged that the CAM could not analyze
other management tools, and as a result, the Council expanded its analyses to account for this
limitation.  (*Id.* at C293.)  For instance, with respect to planned mesh size restrictions, the
Council relied on various published scientific studies.  (*Id.* at C315, C383-85.)  Defendants
similarly assessed the effects of various gear restrictions.  (*Id.* at C393-98.)  Furthermore, in
order to gauge whether fishing mortality rates and management measures would achieve the
rebuilding targets, the Council employed age-based and index-based models in designing
rebuilding trajectories.  (*Id.* at 296-307.)  Given the Secretary's reliance on additional qualitative
and quantitative models and analyses to compensate for the CAM's weaknesses, his choice of the
CAM as one of a number of tools for determining whether the adopted measures would have a
50% probability of success must be accepted as a reasonable exercise of discretion.

CLF next argues that Amendment 13's measures cannot reasonably be expected to have a
50% probability of success, because the new measures simply recycle old ones that have failed
before.  (CLF Mot. at 30-32.)  There are two problems with plaintiffs' argument:  first, their
claim that past management efforts have been unsuccessful focuses too narrowly on a limited

number of species to the exclusion of the significant improvements that have been accomplished in the fishery as a whole.  Second, the past techniques that led to disappointing results have been substantially redesigned, and therefore, it cannot be assumed that the past failures will be repeated.

As for the first claim, the record shows that, although not all species benefited, recent years have seen an overall decrease in fishing mortality rates and an increase in the biomass of the fishery.  For instance, while CLF focuses on the Georges Bank cod, whose biomass decreased from 29,170 mt in 2001 to 26,560 mt in 2002 and whose fishing mortality rate increased from 0.38 to 0.43, the majority of other species have experienced increases in their biomasses and decreases in the F rates.  (A.R. 167 at C1201.)  As an example, witch flounder's biomass increased from 12,300 mt to 18,300 mt, and its F rate fell from 0.76 to 0.41.  (*Id*.)  Of course, while these statistics may not necessarily validate the effectiveness of the management measures that have been employed, since natural forces impact a stock's health and rebuilding speed, they do provide a more balanced picture than CLF has presented.[15]  (*See* TSF Opp'n at 14 n.9.)

As for the second claim that defendants' track record is the best predictor of the future, plaintiffs' argument fails to account for the significant revisions in these tools.  It also ignores the fact that the probability of success of an FMP cannot be measured by evaluating its individual

---

[15]  And, with respect to the Georges Bank cod, while admittedly this stock's biomass has decreased, the Secretary has taken affirmative measures to significantly accelerate the rebuilding of that stock.  For instance, Amendment 13 reduces the stock's F rate by more than half, dropping it to 0.21 in 2004 from an estimated 0.43 in 2002/2003.  (A.R. 166 at C117; *see also* Defs.' Opp'n at 59.)  Moreover, much of the problem with rebuilding cod is beyond the Secretary's control, in that recruitment -- *i.e.*, the amount of juvenile cod that grow enough to become vulnerable to fishing gear (A.R. 167 at C1166) -- has been below average for the past fifteen years.  (*See* A.R. Supp. 43 at 12.)

management tools in isolation, for the overall mix of tools must be considered, and as argued by

defendants, Amendment 13's unique combination of effort reduction measures are not the same

as those that were used in the past.  (Defs.' Opp'n at 55-58.)

For instance, plaintiffs attack the Secretary's failure to effectively decrease the total

number of DAS available to vessels.  (CLF Mot. at 31-32; CLF Reply at 20.)  But as a threshold

matter, the DAS program revisions are not intended, as a stand-alone measure, to impact fishing

mortality; rather, they set the stage for reducing allocations of DAS over time as needed.  (A.R.

166 at C380.)  To do this, Amendment 13 is designed to make future DAS reductions an

effective vehicle for limiting fishing effort by setting DAS based on actual usage (as opposed to

allocation numbers as they exist on permits, whether used or not), thereby eliminating latent

capacity and making the caps more effective.  (*See* A.R. 166 at C381; *see also* Defs.' Opp'n at 20

& n.5 (citing A.R. 167 at C1416).)

But even if the revisions in DAS are not designed to affect F rates in the current fishing

year, the number of DAS used has nonetheless dropped significantly.  DAS usage under

Amendment 13 for the first nine months of the current fishing year (24,229 DAS used) has

dropped 26% relative to the same period last year (30,507).  *See supra* Cumulative DAS Usage

by Month for Multispecies Limited Access Vessels.  Plaintiffs also fail to acknowledge the

significant change in how DAS are used under Amendment 13 as compared to its predecessors.

Thus, although the total theoretical number of DAS available has increased under Amendment

13, the number available for fishing overfished stocks has been significantly curbed.  For the first

time, Amendment 13 divides DAS into two categories:  unrestricted "A" which may be used to

target any groundfish stock, subject to the general limitations contained in Amendment 13, and

limited "B" DAS.  *See* 69 Fed Reg. at 22,909.  In the past, only unrestricted DAS existed, but

under the new measures, these have been reduced to just 60% of the total DAS available.  *Id*

(discussing A DAS).  The remaining 40% -- the B DAS -- may only be used under certain

conditions, such as in highly-regulated SAPs.  The result nine months into the first fishing year

following Amendment 13's promulgation is that, even as A DAS usage is at less than 50% of the

total allocated for the full year, B DAS usage is even lower:  only about 5% of the full year's

allocation.[16]  *See* NMFS-Fishery Statistics Office, Cumulative DAS Usage by

Month and DAS Category for Multispecies Limited Access Vessels, *available at*

http://www.nero.noaa.gov/ro/fso/muldas04c.pdf (last visited Mar. 7, 2005).  Thus, as compared

to previous FMPs, Amendment 13 strives to implement a real reduction in the number of

available DAS, which in turn may enable DAS reductions to finally become a viable tool for

achieving the FMP's conservation goals.[17]  As such, the Court must reject CLF's contention that

---

[16]  This figure of 5% may not accurately reflect usage because there were limited opportunities to use B DAS until Framework 40-A became effective on December 28, 2004, at which time SAPs were created.  *See* 69 Fed. Reg. at 67,780, 67,803 (Nov. 19, 2004).  Since that time, statistics show that regular B DAS usage has expanded from a monthly rate of less than sixty DAS before Framework 40-A to nearly 400 per month since.  *See supra* Cumulative DAS Usage by Month and DAS Category for Multispecies Limited Access Vessels.  However, even at this accelerated rate, by January 2005, only 1,144 regular B DAS had been used, and it appears impossible that this subcategory's cap of 26,286 DAS will be reached by April 30, 2005, when the 2004 fishing year ends.  *See id.*

[17]  The more sophisticated DAS structure created by Amendment 13 also allows for more targeted effort reduction techniques.  For instance, if by 2006 certain rebuilding targets are not expected to be achieved, "default measures" will automatically go into effect.  These include, *inter alia*, using "differential DAS counting" to charge a premium to vessels fishing in certain areas (counting 1.5 DAS used for every day spent in the restricted zone) as a further disincentive to fishing in places where effort needs to be reduced in order for stocks to meet their rebuilding targets.  *See* 69 Fed. Reg. at 22,910.  The default measures will also reduce A DAS by an additional 5%.  *See id.*

Amendment 13's treatment of DAS indicates that the current plan to end overfishing is doomed because earlier efforts involving limits on DAS produced disappointing results.

CLF also cites the Secretary's past inaccurate and overly "optimistic estimations of mortality reductions." (CLF Mot. at 31.) Defendants contest the accuracy of these accusations. (*See* Defs.' Opp'n at 59-60.) But leaving the details of this debate aside, plaintiffs' premise must be rejected for a more fundamental reason. Amendment 13 contains a far broader range of measures than was previously the case. In addition to those already discussed, Amendment 13 provides for trip limits, closed areas, TACs, and gear restrictions, such as increased mesh size. *See, e.g.*, 69 Fed. Reg. at 22910-16. The limited evidence so far -- such as decreased landing rates[18] and lower DAS usage -- suggests that, in contradistinction to past problems, this FMP's measures have a more realistic probability of success.

Moreover, there is still much that is unknown about fisheries management. In such a situation, a court should be especially deferential since the agency is "making predictions, within its area of special expertise, at the frontiers of science." *Baltimore Gas,* 462 U.S. at 103. The failures of past management efforts do not dictate the conclusion that the Secretary's current plans must be rejected; rather, earlier errors may be attributable to fisheries science's ongoing but

---

[18] For instance, the latest statistics show that cod landings -- *i.e.*, the "portion of the catch that is harvested for personal use or sold" (A.R. 166 at C1163) -- for the first five months of fishing year 2004, when Amendment 13 took effect, are 65% of the level a year earlier (considering all areas, including the Gulf of Maine and Georges Bank). *See* NMFS-Fishery Statistics Office, Preliminary Cod Landings by Stock Area, Table 1.A, *available at* http://www.nero.noaa.gov/ro/fso/tac0105.pdf (last visited Mar. 7, 2005). Although clearly other factors in addition to Amendment 13, such as resource scarcity, can affect cod landings, when the declining catch figures are combined with the decreasing DAS, it is not unreasonable to infer that Amendment 13's measures are achieving some degree of success in reducing, as planned, the F rate for Georges Bank cod by half and the F rate for Gulf of Maine cod by one third. (*See* A.R. 166 at C117.)

understandable imprecision.  (*See, e.g.*, A.R. 166 at C296 ("These tables should be viewed with

caution.  As noted by [a scientific paper], 'Projections are based on linear rates of increase and as

such they should not be used to project population trends beyond a few years.'  This approach,

however, is the only one available to indicate likely trends in biomass for index-based stocks.").)

Relying on the "best scientific information available," 16 U.S.C. § 1851(a)(2), does not mean

that that scientific data will always turn out to be right, but that is all the Secretary can reasonably

do when devising an FMP for the long term.  *See NRDC v. Evans*, 254 F. Supp. 2d at 440.

Given the uncertainties involved in making predictions, Amendment 13 also requires

periodic assessments to evaluate whether the rebuilding measures are proving successful, and if

targets are not being met, various default measures will be instituted automatically to reduce

mortality rates even further in 2006 and again in 2009.  (A.R. 166 at C116-17; 69 Fed. Reg. at

22,910.)  This is yet another measure that enhances the rebuilding program's probability of

success, for if the data shows it to be necessary, even more restrictive measures than planned will

go into effect.  *See also supra* note 17.

Plaintiffs also challenge the Secretary's selection of rebuilding goals that purportedly set

the bar too low by seeking only to achieve Fmsy, rather than OY target rates, which are set at

75% of Fmsy.  (A.R. 166 at C89, C94.)  (CLF Mot. at 33.)  But as already explained, the MSA

only requires that, in the case of overfishing, OY "provide[] for rebuilding to a level consistent

with producing the maximum sustainable yield in such fishery."  16 U.S.C. § 1802(28)(C).  In

other words, within a rebuilding period, there is no statutory requirement to provide a strict

timetable for achieving OY.  However, once stocks are rebuilt, control rules are instituted, *see,*

*e.g.*, 50 C.F.R. § 600.310(c)(1)(ii), which may lead to further adjustments to catch levels and the

attainment of OY.  (*See* A.R. 166 at C96.)  But at this stage, until the stocks recover, the target

OY that plaintiffs fault the Secretary for failing to achieve is simply inapplicable.

In sum, the Secretary relied on the best scientific information available in determining

that Amendment 13's measures have at least a 50% probability of success.  As such, they comply

with the Circuit's holding in *NRDC v. Daley*, 209 F.3d at 754, and they are reasonable and lawful

under the MSA and the APA.  *See* 5 U.S.C. § 706(2)(A).

### 3.      Does Amendment 13's EIS Comply With NEPA?

CLF also argues that defendants violated NEPA and the Secretary's own NEPA-

implementing regulation by failing to consider sufficient alternative measures and for failing to

adequately inform the public of significant environmental impacts of a major federal action.  As

explained above, NEPA requires that alternatives to proposed federal actions must be evaluated,

the affected environment be described, and the proposed action's impacts, purpose and need laid

out.  *See* 42 U.S.C. § 4332(2)(C); *see also* 40 C.F.R. §§ 1502 *et seq*., 1508.7, 1508.8; National

Oceanic and Atmospheric Administration Administrative Order  216-6 (requiring that "[a]n EIS

must provide a full and fair discussion of significant environmental impacts").  (CLF Mot. at

36-37.)

CLF quotes various criticisms by NMFS scientists that Amendment 13's EIS does not

provide a "simple overview" of the proposals and background, and it "provides little

perspective."  (CLF Mot. at 38 (quoting A.R. 3141 at D-03-4555-56).)  Admittedly, the EIS is

not a model of draftsmanship (*see* CLF Reply at 28-29), but it is legally sufficient.  *See CLF v.*

*Mineta*, 131 F. Supp. 2d at 26 n.16 (deeming the Secretary's NEPA analysis legally sufficient but

strongly recommending that future analyses be better organized and more clearly written).

Particularly in light of the enormous regulatory undertaking that resulted in Amendment 13, it would have been nearly impossible to produce a "simple" overview. *See Oregon Environmental Council v. Kunzman*, 817 F.2d 484, 493-94 (9th Cir. 1987) (acknowledging that "readability" must be viewed pragmatically).  The purpose of an EIS is to "disclose information in terms intelligible to interested members of the public, public servants, and legislators." *Tongass*, 924 F.2d at 1142 (citations and internal quotation marks omitted).  Despite its complexity and the reality that some discussions are scattered throughout an eighteen-hundred page document, as one reviewer put it, "for diligent and well-organized readers and decision-makers, the DSEIS provides enough data to make informed choices on preferred alternatives." (A.R. 3738 at D-04-394.)  Accordingly, the Court will not "fly speck" the EIS.  *See Colorado Envtl. Coalition v. Dombeck*, 185 F.3d 1162, 1172 (10th Cir. 1999).  Rather, the Court assesses "whether there is a reasonable, good faith, objective presentation of the topics." *Id.* (citations and internal quotation marks omitted).

     In the instant case, the Secretary has met that standard.  The EIS discusses repeatedly throughout the document the effects of overfishing, ranging from the implications of allowing it to continue on a short-term basis to its impact on the rebuilding trajectories, and it analyzes the impacts of alternative approaches, including the use of a constant fishing mortality rate.  (A.R. 166 at C85-86, C103-117, C119, C265, C296-338, C645.)  The document also acknowledges that certain stocks, such as the yellowtail flounder and the Georges Bank cod, have only shown gradual improvement and thus warrant further action, including the adjustment of F rates and the

creation of management tools designed to achieve the designated rates.  (*See* A.R. 167 at C1196-1201.)  In short, the Secretary took the required "hard look" at the environmental consequences of his choices.  *See NRDC v. Hodel*, 865 F.2d at 294.

As for the claim regarding the sufficiency of alternatives, *see* 42 U.S.C. § 4332(2)(c)(iii), plaintiffs cite to the Secretary's purported failure to consider "alternatives" with a greater than 50% probability of success.  (CLF Mot. at 40-41.)  But this argument fails both as a matter of law and fact.  First, this Circuit's 50% probability requirement is not itself a "Federal action" for which alternatives are required.  *See NRDC v. Daley*, 209 F.3d at 754.  Second, the Secretary *did* consider numerous options that were at least fifty percent likely to succeed, such as the constant fishing mortality rate options and options that would have achieved rebuilding with a 50% probability of success five years earlier (2009) than adopted by Amendment 13.  (A.R. 166 at C182, C651-55.)

In sum, the Secretary adequately set forth the environmental impacts of the proposed action.  Furthermore, within the range of alternatives that met the action's purposes, the Secretary considered an adequate array of options.  He therefore complied both with NEPA and with its NOAA-specific implementing regulations.  As such, plaintiffs' NEPA claim must be rejected.

### C.     TSF's Claims

Plaintiff TSF raises four claims.[19]  Count One alleges that the final regulations implementing Amendment 13 violate the APA and the MSA, because the Secretary so materially changed the regulations from those approved by the Council that they were not subject to proper

_____

[19]  Pursuant to TSF's and defendants' joint motion, this Court stayed TSF's Counts II and IV-VI on December 9, 2004.

review procedures.  In particular, plaintiff singles out three changes that allegedly contravene the regulations as approved by the Council:  1) the Secretary's deletion of SAPs that enabled fishers to make effective use of restricted B DAS, which were instituted as a stop-gap measure to compensate in part for Amendment 13's reduction in unrestricted DAS;[20] 2) the Secretary's management of the Georges Bank yellowtail flounder fishery by use of a hard TAC of 6,000 mt instead of the 11,713 mt approved by the Council (*compare* 69 Fed. Reg. at 22,912 *with id*. at 22,915); and 3) the Secretary's acceleration of the reduction in F rates, rather than the Council-approved gradual phase-in, which would have provided for a greater period of economic adjustment for fishers.  (TSF Compl. at 20-22; TSF Mot. at 2-3.)

Count Three alleges that the Secretary violated the APA and the MSA by failing to include certain measures in Amendment 13 that, in accordance with MSA National Standard Eight,  would have "minimize[d] adverse economic impacts on [fishery] communities."  16 U.S.C. § 1851(a)(8).  The rejected measures include the SAPs necessary for effective use of B DAS, a phase-in for F reductions, the higher yellowtail flounder TAC, and a "mixed area trips" regulation that purportedly would have increased efficiency by allowing vessels to fish in more than one designated area on a single outing, which in turn would aid fishers by allowing them to move to another area if the first area proved unsuccessful.  (TSF Compl. at 23; TSF Mot. at 13-14.)

---

[20]  As TSF concedes, its substantive objection to the deletion of these SAPs has been satisfied by implementation of Framework 40-A, which became final on December 28, 2004. *See* 69 Fed. Reg. at 67,780, 67,787-90 (creating equivalent of the disallowed Haddock SAP). (TSF Reply at 13-14; *see* Defs.' Surreply at 2 n.2, 6.)  However, TSF submits that it has still suffered a procedural injury.  (TSF Reply at 14.)  This contention is the subject of the mootness discussion herein.

Count Seven alleges that the Secretary acted *ultra vires* by issuing a regulation, 50 C.F.R.

§ 648.85(a)(2)(i)(D), that allows his designee, the Northeast Region Regional Administrator, to

accept and implement TACs recommended by a body other than the Council, which alone is

given that power by MSA, *see* 16 U.S.C. §§ 1852-1853, and whose decisions the Secretary is

limited to accepting, rejecting, or accepting in part.  *See* 16 U.S.C. § 1854.  (TSF Compl. at

25-26.)  Pursuant to the United States/Canada Resource Sharing Understanding, the Regional

Administrator enforced the Trans-Boundary Management Guidance Committee's ("TMGC")

hard TAC of 6,000 mt for Georges Bank yellowtail flounder, rather than the 11,713 mt TAC

initially recommended by the Council in Amendment 13.  (TSF Mot. at 11-12 (citing  69 Fed.

Reg. at 22,912, 22,915, 59,815).)

Finally, Count Eight alleges that Amendment 13's final regulatory flexibility analysis

("FRFA") does not comply with the requirements of the Regulatory Flexibility Act ("RFA"), 5

U.S.C. § 604, because it "rejects economically ameliorative alternatives without rational bases

and it predicates its economic and social impact assumptions, analyses and comparisons on

fishing effort" that Amendment 13, as implemented by the Secretary, inhibits.  (TSF Compl. at

26.)

The Court first addresses whether several of plaintiff's contentions are moot.  It then turns

to the Secretary's purported illegal deviations from the Council's Amendment 13

recommendations.  Finally, the Court reaches the legality of the challenged NMFS regulation

authorizing defendants' Regional Administrator to implement certain quotas recommended by

the TMGC, as opposed to those recommended by the Council.

### 1.    Are Plaintiffs' Claims in Counts One, Three and Eight Moot?

Defendants contend that Counts Three and Eight are moot because Framework 40-A implements the specific measures that plaintiff claims were improperly excluded from Amendment 13, and plaintiff therefore cannot demonstrate a substantive injury sufficient to invoke this Court's jurisdiction.  (Defs.' Opp'n at 72-76 & n.30; Defs.' Surreply at 2-6.) Similarly, defendants argue that TSF's Count One is moot insofar as it relates to the failure to create a Closed Area II Haddock SAP because Framework 40-A has now created this SAP. (Def.'s Opp'n at 75 n.29.)

The Court has an "an affirmative obligation to ensure that it is acting within the scope of its jurisdictional authority."  *Grand Lodge of Fraternal Order of Police v. Ashcroft*, 185 F. Supp. 2d 9, 13 (D.D.C. 2001).  For this Court to rule on an issue raised in plaintiff's complaint, it must present a live case or controversy.  *Lewis v. Continental Bank Corp.*, 494 U.S. 472, 477-79 (1990).  "Even where litigation poses a live controversy when filed, the [mootness] doctrine requires a federal court to refrain from deciding it if 'events have so transpired that the decision will neither presently affect the parties' rights nor have a more-than-speculative chance of affecting them in the future.'"  *Clarke v. United States*, 915 F.2d 699, 701 (D.C. Cir. 1990) (quoting *Transwestern Pipeline Co. v. FERC*, 897 F.2d 570, 575 (D.C. Cir. 1990)).  Where intervening events preclude the Court from granting plaintiff any effective relief, even if it were to prevail on its underlying claims, the Court must dismiss a claim as moot for want of subject matter jurisdiction.  *Church of Scientology of Cal. v. United States*, 506 U.S. 9, 12-13 (1992). *See, e.g.*, *Murphy v. Hunt*, 455 U.S. 478, 481-82 (1982); *Burlington N. R.R. Co. v. Surface Transp. Bd.*, 75 F.3d 685, 688 (D.C. Cir. 1996).

Where a regulation has been superseded, a challenge to the earlier rule is moot.  *See Gulf of Maine Fisherman's Alliance v. Daley*, 292 F.3d 84, 88 (1st Cir. 2002) (holding that the promulgation of a new framework governing a fishery is an intervening event that moots challenges to "either procedural failures or substantive deficiencies associated with a [defunct] regulation") (citing *Save Our Cumberland Mountains, Inc. v. Clark*, 725 F.2d 1422, 1432 n.27 (D.C. Cir. 1984) and *NRDC v. United States Nuclear Regulatory Comm'n*, 680 F.2d 810, 813-15 (D.C. Cir. 1982)); *see also Associated Fisheries of Me. v. Evans*, 350 F. Supp. 2d at 255. Because plaintiff concedes that the substantive relief it seeks in these counts has been provided by Framework 40-A, these counts have been reduced to procedural rights claims.  (*See* TSF Reply at 15 & n.13.)  In such a situation, the mootness analysis "bears close affinity" to the question of whether a party has standing to raise a claim, *see Warth v. Seldin*, 422 U.S. 490, 499 n.10 (1975), and as this Circuit has held, a plaintiff seeking to vindicate procedural rights must "'show[] not only that the defendant's acts omitted some procedural requirement, but also that it is substantially probable that the procedural breach will cause the essential injury to the plaintiff's own interest.'"  *Ctr. for Law & Educ. v. Dep't of Educ.*, 396 F.3d 1152, 1159 (D.C. Cir. 2005) (quoting *Fla. Audubon Soc'y v. Bentsen*, 94 F.3d 658, 664-65 (D.C. Cir. 1996) (en banc)).  In other words, a plaintiff "must show *both* (1) that [its] procedural right has been violated, *and* (2) that the violation of that right has resulted in an invasion of [its] concrete and particularized interest."  *Id.* (emphasis in original).  A "mere procedural misstep *per se*" is an insufficient injury to proceed with a procedural rights case.  *Id.* at 1160.

Here, Framework 40-A has eliminated the economic injury plaintiff relies on in Counts Three, Eight, and One (insofar as it relates to the failure to create SAPs), and, therefore, these

claims must be dismissed as moot.  *See* 69 Fed. Reg. at 67,780 ff. (creating SAPs, implementing

the "B" DAS pilot program, and permitting mixed area trips).  The Court cannot afford plaintiff

any effective relief, for an intervening event -- namely, Framework 40-A -- has adopted the

desired provisions which the Secretary had previously disallowed pursuant to 16 U.S.C.

§ 1854(a)(3).  "In effect, [the earlier fishery management plan's] deficiencies have been

eliminated by the promulgation of [a] new Framework[]."  *Gulf of Maine Fisherman's Alliance*,

292 F.3d at 88.

Further, plaintiff's contention that, had the Council had the opportunity to consider the

implications of the FMP as approved by the Secretary, it might have reached different

conclusions regarding the mix of alternatives to recommend is simply too speculative to pass

muster.  *See Florida Audubon Soc'y*, 94 F.3d at 670 (rejecting a "protracted chain of causation")

("The greater number of uncertain links in a causal chain, the less likely it is that the entire chain

will hold true.").  (*See also* Defs.' Surreply at 7-8.)  This is the case here since Framework 40-A

admittedly ameliorates plaintiff's economic injury (*see* TSF Reply at 15 n.13) by adopting the

very proposals plaintiff has advocated.  (*See, e.g.*, TSF Reply at 3-7.)  In short, because plaintiff

has no current injury that can be remedied, TSF's claims under the MSA, APA and RFA are

moot, and Counts Three, Eight, and One as it relates to SAPs are dismissed with prejudice.

### 2.    Did Defendants Follow the Council's Recommendations in Amendment 13 (Count One)?

In the surviving portions of Count One, TSF contends that the Secretary illegally deviated

from the policies proposed by the Council in Amendment 13.  The purported deviations consist

of phasing in F rate reductions faster than proposed by the Council and of applying the TMGC's

hard TAC for Georges Bank yellowtail flounder, rather than the quota previously adopted by the Council. (TSF Mot. at 21-23, 27-28.) In TSF's view, the Council's recommendations became final at its November 6, 2003 meeting and could not be changed thereafter.

Plaintiff relies on the legal principle that the Secretary has only limited powers in reviewing a Council's recommendations: he may only approve, disapprove, or partially approve an Amendment, and any disapproval or partial approval must be based on an identified inconsistency with governing law, including the ten National Standards. *See* 16 U.S.C. § 1854(a)(3); 50 C.F.R. § 600.305(a)(2). TSF further contends that the Secretary must defer to the judgment of the Council and apply what is akin to a clear error or abuse of discretion standard of review, not a *de novo* standard (TSF Mot. at 17 n.15 (quoting *J.H. Miles & Co., Inc. v. Brown*, 910 F. Supp. 1138, 1159 (E.D. Va. 1995)), and under that standard, the Secretary has illegally substituted his own judgment for that of the Council.

These arguments lack factual support. The record plainly shows that the Secretary adopted the very recommendations made by the Council. That several of these decisions were taken at a subsequent meeting of the Council or were contained in the Council's final version of Amendment 13 as submitted to the Secretary does not change the fact that defendants adopted the Council's recommendations without modification. Therefore, the Secretary did not and could not inform the Council of "the nature of [the] inconsistencies" with governing law, *see* 16 U.S.C. § 1854(a)(3)(B), because the Secretary did not identify any such problems pertaining to the policies singled out by the plaintiff. Instead, the Secretary implemented the Council's recommendations.

Plaintiff's confusion about the speed of the F phase-in is traceable to TSF's focus on the transcript of the Council's November 6, 2003 meeting, which leads plaintiff to ignore the fact that the Council's *actual* proposal to the Secretary came in the form of Amendment 13 itself, which was submitted on December 1, 2003 and which contained the precise specifications later adopted by the Secretary.  (*See* A.R. 166 at C1.)  At the November meeting, a Council member referred to specific phase-in targets that were presented in draft form to the Council on that date and which were less restrictive than those the Council ultimately proposed in Amendment 13.  (*See* A.R. 26 at A5111-12.)  However, this mere reference to preliminary numbers during an hours-long discussion does not demonstrate that the Council adopted those numbers.  Moreover, this understanding is validated by subsequent correspondence that indicates that "[t]he Council did not vote on any motion that adopted [those] fishing mortality rates."  (A.R. 3553 at D-03-6863.)  Further, the Council clearly demonstrated its intent to leave the computation of various final figures to its Plan Development Team ("PDT").  (*See* A.R. 26 at A5118.)  In fact, a suggestion by the chairman to limit the PDT's role to simply computing DAS reductions based on the specific F targets already before the Council was rejected, and the Council instead directed its PDT to flesh out the specifics during the following three weeks (before the final Amendment 13 was submitted on December 1).  (*See id.* at A5112; *see also id.* at A5116.)

In the end, the F targets being phased in by the Secretary are precisely those adopted by the Council in its final version of the Amendment as submitted to defendants.  *See* 68 Fed. Reg. at 74,939.  In Amendment 13, the Council was explicit:  "the Council is not following the trajectories shown in [the table before the Council at the November 6 meeting]."  (A.R. 166 at C105.)  Rather, the Council formally proposed an accelerated phase-in, which the Secretary

implemented in Amendment 13.  (*See id.* at C115-18.)  Thus, no reasonable reading of the record

supports plaintiff's contention that the Secretary illegally deviated from the fishing mortality

rates submitted by the Council.  Rather than supplementing his own expertise or judgment for the

Council's, he followed its recommendations, pursuant to 16 U.S.C. § 1854(a)(3).

Similarly, plaintiff's objection to the Secretary's implementation of a 6000 mt hard TAC

for yellowtail flounder must be rejected, because the Council adopted that very TAC on January

28, 2004.  (A.R. 27 at 5149.)  The Secretary reasonably incorporated this revision into the

version of Amendment 13 published for public notice and comment in the Federal Register the

following day.  69 Fed. Reg. at 4370.  Although printing lead times required by the Office of the

Federal Register meant that the Secretary had already submitted the Amendment for publication

prior to the Council's final action, the Secretary was merely effectuating the Council's prior

decision to incorporate TMGC's quotas into Amendment 13.  The Council had already stated in

its final Amendment 13, as submitted to the Secretary, that the Council had voted at its public

July 2002 meeting to incorporate the US/Canada Understanding into the Amendment, and that

American vessels would not exceed the allocations set under the Understanding.  (A.R. 166 at

C123.)  Although the TMGC did not formally endorse the 2004 quotas until mid-December

2003, the TACs were "expected," and Council approval of them was virtually assured by its prior

decision to incorporate the Understanding into Amendment 13.  69 Fed. Reg. at 4370.  Moreover,

the Federal Register notice made clear that if the Council unexpectedly did not ratify the quotas

from the Understanding, whatever other decision was taken would be subject to another round of

notice and comment.  *Id.*  As it turned out, the Council adopted the TACs, which were

incorporated into the proposed Amendment 13 and were the subject of notice and comment. Therefore, Count One is dismissed with prejudice.

### 3.    Is the Regulation Authorizing the Regional Administrator to Implement TMGC's Hard TACs Invalid (Count Seven)?

In Count Seven, TSF alleges that the Secretary acted illegally in promulgating 50 C.F.R. § 648.85(a)(2)(i)(D), which authorizes the NMFS Regional Administrator to implement the TMGC's recommended hard TACs in the event that they differ from those recommended by the Council. TSF argues that this measure was not a part of Amendment 13, and its promulgation was therefore not authorized by the MSA and thus *ultra vires* because the power it purports to confer "eschew[s] legally-mandated processes for approving or disapproving Council regulations." (TSF Mot. at 40; *see also* TSF Reply at 20-23.)

TSF's objection is well taken. Although the Council generally adopted the US/Canada Understanding as a part of Amendment 13, including its formula for calculating the hard TACs for the Georges Bank (A.R. 166 at C123), and although the Council specifically recommended implementation of the 2004 TMGC quotas (A.R. 27 at 5149), Amendment 13 also made clear that the Council had to approve the TMGC's annual recommendations before they could be implemented. (A.R. 166 at C124 ("Note that for the U.S. fishery, all harvest levels and any measures must be approved and submitted by the Council before implementation. This provides opportunity for public comment. If the Council or [the Gulf of Maine Advisory Committee] disagree with TMGC recommendations, they will be referred back to the TMGC for further refinement.").)

In effect, the challenged regulation allows the Secretary to do an end run around the

Council.  It provides that "[i]f the recommendation of the Council is not consistent with the

recommendation of the TMGC, the Regional Administrator may select either the

recommendation of the TMGC, or the Council."  50 C.F.R. § 648.85(a)(2)(i)(D).  The plain

language of the regulation is clearly inconsistent with Amendment 13.

In response, defendants argue that the Secretary has broad authority to promulgate

regulations in order to effectuate a FMP, and that the challenged regulation is required to give

effect to Amendment 13's endorsement of the broad outlines of the US/Canada Understanding.[21]

(Defs.' Opp'n at 76-79.)  Although it is indisputable that the Secretary has "general responsibility

to carry out" Amendment 13 and that he may "promulgate such regulations, in accordance with

[the APA], as may be necessary to discharge such responsibility," 16 U.S.C. § 1855(d), his

powers are limited.  "The Magnuson-Stevens Act is clear that when the Secretary is presented

with proposed amendments and regulations, he does not have the independent authority to, *sua*

*sponte*, add a regulation that is inconsistent with the proposal from the Council."  *Connecticut v.*

*Daley*, 53 F. Supp. 2d 147, 160-161 (D. Conn. 1999) (citing *Midwater Trawlers Coop. v.*

*Mosbacher*, 727 F. Supp. 12, 16 (D.D.C.1989)); *see also Associated Fisheries of Me. v. Evans*,

350 F. Supp. 2d at 253, 255.  In particular, although the Secretary has broad authority to

implement a FMP, he may not deviate from a council's recommendation except as provided by

---

[21]  The United States/Canada Resource Sharing Understanding is not a treaty, formal
international agreement, or memorandum of understanding.  Rather, it is an "informal
agreement" between the two nations.  (A.R. 166 at C122.)

statute.  He may only "approve, disapprove, or partially approve a plan or amendment," 16

U.S.C. § 1854(a)(3), and where he takes any action other than to fully approve a plan or

amendment, he must give the council written notice of his action, as well as state the legal flaw

in the council's proposal and recommend corrective action to the council.  *Id.*  In short, the more

specific terms of § 1854 serve as a limit on the Secretary's broad regulatory powers described in

§ 1855.  *See Gozlon-Peretz v. United States*, 498 U.S. 395, 407 (1991) ("A specific provision

controls one of more general application.").

In this case, the Secretary never gave notice that he was deviating from Amendment 13's

recommendation that the Council must assent to TMGC's annual TAC proposals before they

could be implemented by the Secretary.[22/]  Nonetheless, defendants cannot plead ignorance, for

they were informed weeks before publication of the proposed regulation in the Federal Register

that granting the Regional Administrator power to override the Council in this manner conflicted

with the Amendment and had not been authorized.  (A.R. 3717 at D-04-297.)  *See Public Citizen*,

124 S. Ct. at 2214 (a regulatory document's "flaws might be so obvious that there is no need for

a commentator to point them out specifically in order to preserve its ability to challenge the

_____

[22/]  This failure to provide any notice, either to the Council or in the version of
Amendment 13 published for public notice and comment, that the Secretary was deviating from
the Council's recommendation disarms defendants' complaint that TSF failed to comment on the
proposed regulation "in order to allow the agency to give the issue meaningful consideration."
(*See* Defs.' Opp'n at 79 (quoting *Dep't of Transp. v. Public Citizen*, 124 S. Ct. 2204, 2213
(2004) (discussing NEPA)).)  Moreover, in the context of the MSA, courts have entertained
objections to the Secretary's actions even where plaintiffs did not comment on the proposed
regulation.  *See, e.g.*, *Stinson Canning Co., Inc. v. Mosbacher*, 731 F. Supp. 32, 34 (D. Me.
1990).  In any event, TSF did submit general comments noting that the ultimate Amendment
adopted by the Secretary should conform to the Council's intent, which is the ultimate legal issue
here.  (A.R. 3752 at D-04-592.)

proposed action" and "the agency bears the primary responsibility to ensure that it complies with" governing law).

In light of the Secretary's improper substitution of his own recommendation in place of the Council's, the Court is constrained to hold that the third sentence of 50 C.F.R. § 648.85(a)(2)(i)(D) was adopted in violation of the MSA and therefore cannot be enforced.

Defendants nevertheless submit that TSF's argument fails to credit the remainder of the challenged provision's language, which specifically provides for notice and comment prior to implementing a TAC at odds with the Council's recommendation. *See* 50 C.F.R. § 648.85(a)(2)(i)(D) ("NMFS shall review the Council's recommendations and shall publish in the Federal Register the proposed TACs and provide a 30-day public comment period.  NMFS shall make a final determination concerning the TACs and will publish notification of the approved TACs and responses to public comments in the Federal Register.").  It may well be that the Secretary *does* possess the legal powers he claims in the challenged regulation, so long as he complies with the requirements of the MSA, the APA and other governing law.  *See, e.g.*, 16 U.S.C. § 1855(c) (discussing emergency and interim measures, which the Secretary may implement without Council approval for up to 360 days); 16 U.S.C. § 1854(c) (discussing Secretarial measures that may be taken where, for instance, a council fails to act within a reasonable time).  "However, the Secretary's authority to promulgate interim measures to reduce overfishing is legally and historically distinct from his power to issue rules to implement [fishery management plans] and amendments."  *Associated Fisheries of Me. v. Evans*, 350 F. Supp. 2d at 255.  Thus, regardless of whether the Secretary might legally be able to either unilaterally impose TMGC's proposed TACs or promulgate, outside of a rulemaking proceeding implementing a

FMP, a regulation identical to the one rejected here, he could not promulgate the challenged

regulation as part and parcel of the Amendment 13 approval process, because it is directly at

odds with the Amendment as submitted by the Council.

Given the Council's broad endorsement of the US/Canada Understanding, as well as the

Council's demonstrated track record of adopting the TMGC's proposed TACs, it may be true that

the Regional Administrator would not have cause to overrule the Council in the manner

envisioned by the disallowed provision of 50 C.F.R. § 648.85(a)(2)(i)(D).  This improbability,

however, does not cure the problem.[23]  Therefore, the Court grants summary judgment in favor

of TSF on Count Seven.


## II.      Essential Fish Habitat

### A.      Background

The 1996 SFA made protection of EFH a priority.  It defines EFH as "those waters and

substrate necessary to fish for spawning, breeding, feeding or growth to maturity."  16 U.S.C.

§ 1802(10).  Without protective measures, groundfish EFH can be harmed by certain types of

fishing gear and methods, like scallop dredges and bottom trawls.  (A.R. 1438 at D-02-679.)

-------

[23]  At the February 25, 2005 hearing, the Secretary argued for the first time that plaintiff's
challenge to this regulation is not yet ripe, because the Regional Administrator has not yet
overridden the Council's recommendations in adopting the TMGC's TACs, and plaintiff has
therefore not been "adversely aggrieved."  (Hearing Transcript at 73.)  However, plaintiff raises a
facial challenge to the regulation, and as such, TSF need not wait for the Regional Administrator
to invoke her powers under it.  *See Hudson v. FAA*, 192 F.3d 1031, 1035 n.3 (D.C. Cir. 1999)
(citing *JEM Broadcasting Co., Inc. v. FCC*, 22 F.3d 320, 325-26 (D.C. Cir.1994)) ("A rule of
agency procedure, by contrast, will typically be ripe on a facial challenge."); *see also Better
Government Ass'n v. Dep't of State*, 780 F.2d 86, 95-96 (D.C. Cir. 1986) (holding that, where a
challenge to an agency regulation involves "purely legal issues," a facial claim concerning the
regulation's inconsistency with governing law is ripe for review).

Such devices disturb the ocean bottom, particularly gravel and sand substrate that is an important environment for juvenile groundfish, such as cod.  (A.R. 54 at B1743.)  These areas provide protective cover from predators and may have a substantial effect on recruitment and on cod survival beyond the juvenile stage.  (A.R. 49 at B1327; A.R. 69 at B2762.)

Thus, in order to preserve such vital habitat, the MSA now requires that FMPs "describe and identify [EFH] for the fishery . . . , minimize to the extent practicable adverse effects on such habitat caused by fishing, and identify other actions to encourage the conservation and enhancement of such habitat."  16 U.S.C. § 1853(a)(7).  The Secretary subsequently promulgated a regulation that, in addition to the provisions included in the MSA itself, further allows for the designation of a subset of EFH as a Habitat Area of Special Concern ("HAPC").  *See* 50 C.F.R. § 600.815(a)(8).

The designation of EFH protective measures is a federal action that must comply with NEPA, which, as explained above, is essentially a procedural statute, *see Robertson*, 490 U.S. at 350-51, that requires an agency to consider the environmental effects of its actions, as well as a reasonable range of alternatives to its proposed actions.  42 U.S.C. § 4332(2)(C).  This evaluation takes the form of a "detailed statement," *see id.*, called an Environmental Impact Statement ("EIS").  While an EIS should "[r]igorously explore and objectively evaluate all reasonable alternatives," 40 C.F.R. § 1502.14, and an agency may not limit itself to only one end of the spectrum of possibilities, *see, e.g.*, *Sierra Club v. Watkins*, 808 F. Supp. 852, 872 (D.D.C. 1991), the decisionmaker need not evaluate all conceivable options.  *Vermont Yankee*, 435 U.S. at 551. Rather, the adequacy of an EIS is evaluated according to a "rule of reason" standard.  *Tongass*, 924 F.2d at 1140.

In *AOC*, Judge Kessler considered a variety of Environmental Assessments ("EAs") that had been produced by five regional councils, including the New England Council.  According to the Court's findings, the EA relating to the New England fishery contained only one section on environmental impacts of the proposed measures that was one paragraph long and essentially discussed currently existing management measures.  Moreover, the EA considered only three options:  the status quo, the EFH Amendment proposed by the Council, and a total closure of the habitat area of particular concern to all fishing gear.  It lacked any discussion of the long-term impacts of any of these options.  183 F. Supp. 2d at 7.

Despite this lack of detailed analysis, the Court rejected plaintiffs' MSA and APA challenges to the Council's EFH Amendment.  *Id*. at 14.  The Court found that the Secretary approved the Amendment after considering whether it complied with the MSA given the best available scientific evidence, and it was reasonable to conclude that additional protective measures were not needed, given those already in place and the lack of available scientific evidence on the adverse effects of fishing gear.  *Id*. at 14-15.

The *AOC* Court did, however, find that defendants had violated NEPA and the governing regulations.  *Id*. at 20.  The Court found that all of the EAs prepared by the five councils failed to properly consider whether a more comprehensive EIS was required,[24] and most importantly, they failed to consider all relevant and feasible alternatives and to fully explain the environmental

---

[24]  An EA is essentially an abbreviated EIS.  In some circumstances, an agency may choose to prepare an EA, which is a "concise public document . . . that serves to (1) Briefly provide sufficient evidence and analysis for determining whether to prepare an environmental impact statement or a finding of no significant impact ["FONSI"]."  40 C.F.R. § 1508.9(a).  An EA must also briefly discuss alternatives to the proposed action.  *Id.* § 1508.9(b).  If the agency, after completing an EA, determines that a full EIS is not necessary, it prepares a FONSI that sets forth the reasons why the action has no significant impact on the environment.  *Id.* § 1501.4, 1508.13.  *See AOC*, 183 F. Supp. 2d at 17-18.

impact of the proposed action and alternatives. *Id*. at 20-21. Finding that defendants' EAs

violated NEPA, the Court ordered defendants "to perform a new and thorough EA or EIS as to

each EFH Amendment, in compliance with the requirements of NEPA." *Id*. at 21.

Following this decision, the parties entered into a Joint Stipulation, which, in pertinent part,

provided that:

> Each EIS (or, where appropriate, the portions thereof relating to EFH) prepared
> pursuant to this Joint Stipulation and Order will consider a range of reasonable
> alternatives for minimizing the adverse effects (as defined by the EFH regulations
> at 50 C.F.R. § 600.810) of fishing on EFH, including potential adverse effects.
> This range of alternatives will include "no action" or status quo alternatives and
> alternatives setting forth specific fishery management actions that can be taken by
> NMFS under the Magnuson-Stevens Act. The alternatives may include a suite of
> fishery management measures, and the same fishery management measures may
> appear in more than one alternative.

(A.R. 1331 at D-01-3105-06 ¶ 6.)

Consistent with the requirements of the Joint Stipulation, the Secretary has now prepared

a full EIS, not merely an EA. The Secretary considered nearly two dozen different options for

protecting EFH, many of which had several subparts. These analyses span forty pages. (A.R.

166 at C160-166, C250-263, C272-92.) Among the options considered were closing various

essential fish habitats to fishing, expanding the list of gears prohibited in closed areas, requiring

better monitoring systems on vessels, and reducing fishing effort such as by allowing fishers

fewer DAS. (*Id*.) The Secretary also considered preserving the status quo, *i.e.*, taking no action

"specifically intended to protect essential fish habitat or reduce impacts associated with fishing."

(*Id.* at C250.) Amendment 13 does not designate any new HAPCs, but it does incorporate a

preexisting one that protects juvenile cod. 69 Fed. Reg. at 22,923. (*See also* A.R. 166 at C162.)

**B.      Oceana's Claims**

Plaintiff Oceana nevertheless contends that the Secretary violated the MSA, NEPA, and the APA by not adequately evaluating sufficiently large geographic areas for closure to fishing in order to protect EFH and by failing to consider the designation of additional HAPCs.  Both NEPA and the Secretary's implementing regulations under the MSA require consideration of a range of alternative measures that could be taken to address adverse effects on EFH, *see* 42 U.S.C. § 4332(2)(C)(iii); 50 C.F.R. § 600.815(a)(2)(ii), and according to Oceana, defendants did not consider an adequate range of alternatives in determining how to protect EFH, but, in violation of the SFA, they only considered options less protective of EFH than the status quo in existence at the time of *AOC*.   *See* 16 U.S.C. § 1853(a)(7). (Oceana Mot. at 28, 31.)  Oceana does not, however, contend that the alternative adopted by the Amendment to address adverse impacts to EFH is unreasonable.  (*See* Defs.' Opp'n at 80 n.32.)

**1.      Does the EIS Consider An Adequate Range of Alternatives
for Protecting EFH in Compliance With NEPA?**

As argued by Oceana at the hearing on this matter, the question of whether the Secretary considered an adequate range of alternatives breaks down into two subparts:  (1) whether Oceana is correct to focus on habitat closures as an important means to protect EFH, such as for the depleted stocks of juvenile cod; and (2) if closing areas is indeed the appropriate focus of EFH protection measures, then was the range of alternatives considered by the Secretary reasonable? (Hearing Transcript at 81.)

As to the first question, the record establishes that closing areas is indeed an effective means of protecting EFH, but it cannot be read to support the conclusion that such measures

must be the primary focus of such efforts.[25/]  While it is true, as argued by Oceana (*id*.), that a

report of a NMFS-sponsored conference found that spatial closures are "an important tool to

minimize gear impacts on habitat" in order "[t]o protect critical and/or vulnerable habitat areas,"

(A.R. 1438 (Gear Effects Workshop Report) at D-02-682), the report also recognized that other

methods are likewise important, including effort reduction (such as cutting fishers' DAS) and

gear modification (*e.g.*, making otter trawls lighter and lowering the turbulence associated with

them).  (*Id.* at D-02-664.)

    Other sources cited by plaintiff in support of the argument that area closures are a

superior alternative actually acknowledge the necessity of limiting this alternative's use in order

to account for other purposes required by the MSA.  (*See, e.g.*, A.R. 54 at B1746-47 (discussing

_____

    [25/]  In this regard, it is significant to note that neither the MSA nor the Joint Stipulation
mentions closures, and as is clear from NMFS regulations, there are numerous options for
managing adverse effects from fishing which may include, but are not limited to:

> (A) *Fishing equipment restrictions*.  These options may include, but are
> not limited to: seasonal and area restrictions on the use of specified
> equipment, equipment modifications to allow escapement of particular
> species or particular life stages (*e.g.*, juveniles), prohibitions on the use
> of explosives and chemicals, prohibitions on anchoring or setting
> equipment in sensitive areas, and prohibitions on fishing activities that
> cause significant damage to EFH.
> (B) *Time/area closures*.  These actions may include, but are not limited
> to:  closing areas to all fishing or specific equipment types during
> spawning, migration, foraging, and nursery activities and designating
> zones for use as marine protected areas to limit adverse effects of fishing
> practices on certain vulnerable or rare areas/species/life stages, such as
> those areas designated as habitat areas of particular concern.
> (C) *Harvest limits*.  These actions may include, but are not limited to,
> limits on the take of species that provide structural habitat for other
> species assemblages or communities and limits on the take of prey
> species.

50 C.F.R. § 600.815(a)(2)(iv)(A)-(C).

an area rotation system that leaves most areas open to fishing); A.R. 2404 at D-02-4631

(recognizing that certain areas, such as Georges Bank gravel habitat, have a high priority for

protection, whereas other areas are less vulnerable and warrant lower priority, particularly in

southern New England, where such areas are "dominant"); A.R. 2265 at D-02-4103 (noting that

while complex hard bottoms are very important to certain groundfish, "it can be argued that

closing [sand] areas in the [Mid-Atlantic Bight] are not needed to protect [Northeastern]

species," even though a number of such closure alternatives were considered).)

 Furthermore, plaintiff's contention that area closures must be the focal point of EFH

protection measures is contradicted by the findings of the National Research Council ("NRC"),

which concluded that effort reduction, *not* area closures, is the "cornerstone" for mitigating the

adverse effects of trawls and dredges on seafloor habitat.  69 Fed. Reg. at 22,922.  More

importantly, the NRC acknowledged that area closures, in addition to other measures, are an

important component of a plan for protecting EFH, and therefore, it recommended a mix of

measures -- consisting of effort reduction, gear modifications, and area closures -- as the most

effective means of protecting EFH, rather than focusing on one approach to the exclusion of the

others.  *Id.*  Thus, the NRC report does not buttress Oceana's singular focus on area closures.

 In short, although the record establishes that area closures are an important EFH

protective measure that must be analyzed, area closures are an alternative that must be considered

*in conjunction* with other EFH measures.  Therefore, the Court cannot conclude that the range of

alternatives should be limited to a spectrum of closures.

 Given this answer to Oceana's first question, its second inquiry must be modified to ask

whether, in light of habitat closure's role as one of several methodologies for protecting EFH, the

Secretary considered adequate alternatives that included area closures as a constituent part of a comprehensive solution for protecting EFH?  In addressing this question, the Court finds the First Circuit's treatment of this very issue in *CLF v. Evans* to be instructive.  There, the court rejected the argument of Oceana and CLF that the Secretary had acted unlawfully in failing to close four areas to scallop harvesting in order to protect EFH, finding that plaintiffs' contentions were "flawed to the extent that they consider the closure alternative in isolation, discounting numerous other restrictions on scallop fishing imposed by [the] Framework."  360 F.3d at 28. Those other measures included "restrictions on days at sea, catch and mesh sizes, and seasonal access to sensitive areas."  *Id.*  Similarly, the range of alternatives that the Secretary should have considered here is not defined solely in terms of the percentage of EFH areas that are closed, but rather must include a variety of forms of closures in combination with other EFH protection methodologies, as well.  Of course, the range of alternatives warranting consideration is also defined in terms of the regulatory action's purpose, *see City of Alexandria*, 198 F.3d at 867, and therefore options that are inconsistent with the MSA need not be considered.

In stark contrast to the three options considered in *AOC* (*see* 183 F. Supp. 2d at 7), defendants in this case evaluated twenty-three separate EFH protection alternatives, many with numerous sub-options. (A.R. 166 at C160-166, C250-263, C272-92.)  Among these were ten different closure alternatives, each designed according to a different set of criteria and evaluated in terms of their EFH protectiveness.  (*Id.*)  Thus, Amendment 13's EIS is quantitatively far more expansive than the deficient EAs that Judge Kessler rejected in *AOC*, and for that reason, the analogy between this case and *AOC* does not work.  (Oceana Mot. at 30.)[26]

---

[26]  In fact, the instant case is factually more akin to Judge Kessler's ruling in *CLF v. Mineta*.  There, the Court found that defendants' EFH analysis concerning New England area

Despite the Secretary's consideration of a far greater number of alternatives, Oceana

argues that defendants did not consider a broad enough spectrum of closures, and in particular,

that the range of alternatives considered was no more protective of EFH than the no action

alternative (or status quo) that was before the Court in *AOC*.  In making this argument, Oceana

misstates the record regarding the Council's position on the no action alternative,[27/] and

unjustifiably focuses solely on the relative percentage of geographic area "closed" to certain

kinds of groundfish fishing under the plan in effect prior to *AOC*, as compared to the percentage

of closures considered as part of Amendment 13's EIS.  (*See* Oceana's Mot. at 17-18.)  As was

the case in the First Circuit, its argument is thus "flawed to the extent that it considers the closure

alternative in isolation, discounting numerous other restrictions," *CLF v. Evans*, 360 F.3d at 28,

and to the extent that it ignores the significant qualitative difference between a groundfish

closure and an EFH closure.

In fact, Amendment 13's EIS made clear that the no action alternative "was not selected

because it does not address the [Magnuson-Stevens] Act requirements to minimize, to the extent

practicable, the adverse effects of fishing on EFH."  (A.R. 166 at C250.)  The Council deemed

---

closures satisfied NEPA where the EA was "almost nine pages in length, [and] cited at least six
scientific studies which addressed various EFH-related issues, most notably the interaction
between fishing and ocean bottom habitat."  131 F. Supp. 2d at 29.

[27/]  Oceana also mischaracterizes defendants' legal position and accuses them of
misreading the law.  (Oceana Reply at 8-9.)  Defendants do *not* argue, as stated by Oceana, that
"regardless of [NMFS'] statutory mandate, it is free to restrict the range of alternatives
considered to alternatives no more protective of essential fish habitat than No Action."  (*Id.*)
Rather, it is the the Secretary's position that the no action alternative offered the *least* habitat
protection of all the EFH alternatives evaluated (Defs.' Opp'n at 90-91), and that he considered
"an expansive range of management measures for providing direct and indirect protection to a
wide variety of EFH for a wide variety of fish species" (*id.* at 87) in compliance with his
statutory duty and regulatory commitment to undertake measures to protect EFH.  (*Id.* at 79
(citing 16 U.S.C. §§ 1853(a)(7), 1855(b)(1)(A)), 83 (citing 50 C.F.R. § 600.815(a)(2)).)

other alternatives to be more protective than the status quo option, and rejected the no action plan because of its EFH inadequacies. (*Id.*) Thus, rather than admitting that he subverted his commitment to consider options more protective of EFH than the no action alternative, the Secretary has consistently maintained that the non-status quo alternatives that were evaluated were bona fide measures designed to offer new protections for EFH.

Moreover, the range of alternatives evaluated by the Secretary consisted of measures that, as recommended by the NRC, applied a variety of different tools to minimize harm to EFH. Thus, some tools reduced fishing effort and controlled fishing capacity (A.R. 166 at C161), others banned or restricted to varying degrees gear types believed harmful to EFH, including considering which areas would benefit the most from these restrictions (*id.* at C160, C261-62), others considered improved monitoring systems in order to better understand fishing effort as a technique for protecting EFH (*id.* at C262), and others focused on a variety of closure options designed to protect EFH in ways not addressed by the prior groundfish closures at issue in *AOC*. (*Id.* at C161-166, C250-263, C272-92.)

For instance, among the closure options, some were designed in particular to protect hard-bottom habitats (*id.* at C250), some sought to balance fishery productivity while protecting EFH (*id.* at C277), and some took account of closures designed for other regulatory purposes, such as stock rebuilding or as part of the Atlantic Sea Scallop FMP.[28] (*Id.* at 251, 255.) The Secretary went so far as to consider closing the entire fishery to bottom-tending mobile fishing gear,

---

[28] It is difficult to close areas to scallop gear without displacing the entire fishery, because unlike the harvesting of other species, in most environments scallops can only be fished using techniques that cause some degree of damage to the EFH of juvenile groundfish. (A.R. 54 at B1747.)

including otter trawls.[29] (*Id.* at C288.)  Also, in the scallop FMP amendment process, an

alternative was addressed based on Oceana's comments.  (*See* A.R. 2437 at D-02-4739.)  These

alternatives, as well as others, were evaluated in conjunction with other types of management

tools to determine what mix of measures would best protect EFH.

The Secretary also evaluated the no action plan, which closed the largest geographic area

of all the closure options, but which did so in a qualitatively different manner from the closures

designed for EFH protection.  That is, although the preexisting closures -- such as those designed

for stock rebuilding purposes or for minimizing bycatch -- provided some incidental benefits to

EFH (*see* A.R. 166 at C272), habitat closures created for purposes other than EFH protection do

not necessarily maximize benefits to EFH.  *See* 59 Fed. Reg. at 63,928 (implementing emergency

groundfish closures in order to reduce fishing mortality).  (*See also, e.g.*, A.R. 1438 at

D-02-682.)  In contrast to the closure area alternatives actually designed to protect EFH, some of

the groundfish closures were only seasonal and did not bar bottom-tending gear.  69 Fed. Reg. at

22,923.  (*See also* A.R. 166 at C616.)  Moreover, the EFH closures were designed to last

indefinitely, whereas the existing closures in the no action plan could be lifted at any time if the

depleted groundfish stocks for which the areas were designed are rebuilt.  (*Id.*)

---

[29]  This option did not warrant full consideration in the EIS because it was "unnecessary in the extreme, as some bottom-tending mobile fishing gears are not considered to have significant adverse effects on some habitat types."  (A.R. 166 at C288-289.)  Moreover, closing so much area, as Oceana advocates, could actually cause greater damage to the fishery as fishermen would be forced to concentrate their fishing in the smaller areas that remained available to them.  Such effort displacement could lead to numerous unanticipated consequences.  *See* 59 Fed. Reg. at 63,928.  (*See also* A.R. 166 at C958.)  *See also CLF v. Evans*, 360 F.3d at 28 (noting that the Secretary's scallop FMP EIS in fact considered the closure alternative advocated by plaintiff, but rejected it because it "would provide only limited, short-term benefits," since, *inter alia*, other non-scallop fishing would continue in the closed area).

For these reasons, it is overly simplistic, if not misleading, to compare the ten EFH

closures and their various permutations to the no action alternative.  Although the EIS does

juxtapose the no action alternative with the other options with respect to the percentage of square

nautical miles covered by each option (A.R. 166 at 561), fixating on closures as defined in terms

of mileage or a percentage of EFH ignores the substantial differences among the options with

respect to the degree of protection offered to EFH.  Moreover, as explained by the Secretary, he

included the no action alternative in various tables comparing the closed area alternatives only as

a "point of reference. . . .  [I]t is not directly comparable because of the type of closure it

represents."  69 Fed. Reg. at 22,923.

Based on this record, the Court must conclude that the Secretary considered adequate

alternatives that included area closures as a constituent part of a comprehensive solution for

protecting EFH.  The Secretary did not commit the same error of looking, as in *AOC*, at too

narrow a range of alternatives.  Finally, Oceana's assault on the details of the alternatives

evaluated is misplaced, because it focuses on numbers rather than the quality of protection each

of the alternatives affords, and it considers the closure alternatives in isolation.  Thus, Oceana's

argument that the Secretary did not properly consider an adequate range of EFH alternatives must

be rejected.

But Oceana also challenges the scope of the EFH alternatives as a matter of law, arguing

that defendants breached NEPA and related regulations by considering too narrow a range of

options.  As explained, that range must be defined consistent with the purpose of the regulatory

action, and in evaluating the range's breadth, the Court grants "considerable deference to the

agency's expertise and policy-making role."  *City of Alexandria*, 198 F.3d at 867.  Thus, plaintiff

shoulders a heavy burden to demonstrate that the suite of options considered by defendants was not reasonable.

In evaluating a NEPA challenge, the Court makes two inquiries:  "[1] whether an agency's objectives are reasonable, and [2] whether a particular alternative is reasonable in light of these objectives."  *Id*.  In the instant case, the goal of protecting EFH to the extent practicable is set forth by statute, 16 U.S.C. § 1853(a)(7), and is clearly reasonable.  Oceana's challenge focuses on the second inquiry.

In arguing that the range considered was deficient, plaintiff principally relies on a 1981 Council on Environmental Quality ("CEQ") guidance document, "Forty Most Asked Questions Concerning CEQ's National Environmental Policy Act Regulations" ("FAQ").  (Oceana Mot. at 30.)  It explains that:

> For some proposals there may exist a very large or even infinite number of possible reasonable alternatives.  For example, a proposal to designate wilderness areas within a National Forest could be said to involve a number of alternatives from 0 to 100 percent of the forest.  When there are potentially a very large number of alternatives, only a reasonable number of examples, covering the *full spectrum* of alternatives, must be analyzed and compared in the EIS.  An appropriate series of alternatives might include dedicating 0, 10, 30, 50, 70, 90, or 100 percent of the Forest to wilderness.  *What constitutes a reasonable range of alternatives depends on the nature of the proposal and the facts in each case.*

46 Fed. Reg. at 18,027 (emphasis in last sentence added).  This document is merely an informal statement, however, and it does not create any additional obligations beyond those included in the NEPA regulations themselves.  *See Cabinet Mountain Wilderness/Scotchman's Peak Grizzly Bears v. Peterson*, 685 F.2d 678, 682 (D.C. Cir. 1982).  Moreover, it must, of course, be construed consistent with the well-established body of law concerning the nature and scope of

NEPA analyses.  By its own terms, and consistent with *City of Alexandria*'s rule that the range of

alternatives is defined by the goals of an action, 198 F.3d at 867, the FAQ acknowledges that

what is a reasonable range will vary depending on the facts of each case and the nature of the

proposal.  Thus, the FAQ, standing alone, does not advance Oceana's argument.  Its example of

various percentages that would reasonably be evaluated in designating forest wilderness area is

inapposite, for here, as explained above, the range cannot be defined solely by looking to mere

percentages of EFH closed.  Rather, the inquiry is whether a range of alternatives as defined in

terms of EFH protectiveness -- encompassing much more than the simple percentage of closed

areas -- was adequately evaluated.

Oceana next points to *California v. Block*, 690 F.2d 753 (9th Cir. 1982), as support for its

focus on geographic percentages for defining the proper range of alternatives.  There, in line with

the FAQ example cited above, the court rejected an EIS that evaluated alternatives at only one

end of the spectrum of possibilities in considering what portion of a national forest to designate

as wilderness.  The agency had only considered alternatives that protected no more than one-third

of the forest.  *Id.* at 768-69.  But *Block* is inapposite, for here the focus was not on the relatively

straightforward goal of protecting various percentages of a forest from development, *see id.* at

767, but rather was on the more complex goal of "minimiz[ing] to the extent practicable adverse

effects on [EFH] caused by fishing, and identify[ing] other actions to encourage the conservation

and enhancement of such habitat."  16 U.S.C. § 1853(a)(7).  This goal had to be evaluated not

merely in terms of mileage closed, but also in terms of affirmative actions taken to regulate

vessels' activities in the closed areas; restorative measures, such as seeding, that might be

implemented to rejuvenate EFH (*see* A.R. 166 at C290); and the specific sections and types of

EFH that would be closed.  Thus, the goal of the action in *Block* was amenable to a numbers-based approach, whereas the purpose of Amendment 13, as it relates to EFH, is not conducive to such an approach, both because of the complexity inherent in weighing alternatives based on different tools, and because protecting EFH is not the only goal of the MSA.

Rather, EFH must be protected to the extent *practicable*, 16 U.S.C. § 1853(a)(7), and in a manner consistent with MSA's overriding principle that conservation measures should achieve OY from the fishery on a continuing basis, 16 U.S.C. § 1851(a)(1), which may become more and more difficult the greater the closures.  *See supra* note 29.  In the SFA, Congress did not define "practicable" in the context of what constitutes an appropriate means of minimizing adverse effects on EFH.  *See* 16 U.S.C. § 1853(a)(7).  Because Congress did not speak clearly on the issue, the Secretary's interpretation of the statute warrants deference, *Chevron*, 467 U.S. at 843-44, so long as it is "reasonable and consistent with the statutory purpose."  *Troy Corp. v. Browner*, 120 F.3d 277, 285 (D.C. Cir. 1997).  To carry out his duties, the Secretary enacted a regulation to explain the scope of an FMP's practicability analysis.  "In determining whether it is practicable to minimize an adverse effect from fishing, Councils should consider the nature and extent of the adverse effect on EFH and the long and short-term costs and benefits of potential management measures to EFH, associated fisheries, and the nation, consistent with national standard 7 [which states that '[c]onservation and management measures shall, where practicable, minimize costs and avoid unnecessary duplication.']"  50 C.F.R. § 600.815(a)(2)(iii).  Amendment 13's definition of "practicability" is consistent with this regulation:  "reasonable and capable of being done in light of available technology and economic considerations."  (A.R. 166 at C605.)

By contrast, Oceana's singular focus on alternatives that close fishing grounds in order to protect EFH ignores these statutory mandates and effectively reads "practicable" out of the MSA. Indeed, the First Circuit has already rejected this reading of the SFA.

> [P]laintiffs [Oceana and CLF] essentially call for an interpretation of the statute that equates "practicability" with "possibility," requiring NMFS to implement virtually any measure that addresses EFH and bycatch concerns so long as it is feasible. . . .   The closer one gets to the plaintiffs' interpretation, the less weighing and balancing is permitted.  We think by using the term 'practicable' Congress intended . . . to allow for the application of agency expertise and discretion in determining how best to manage fishery resources.

*CLF v. Evans*, 360 F.3d at 28.  Thus, the court construed the SFA in a manner that gives the term "practicable" real force by affording the Secretary substantial discretion in determining what EFH protection measures are realistic, and thereby defining the alternatives to be evaluated in conformity with that practicability assessment.[30/]

This Court is persuaded by the First Circuit's reasoning, and therefore holds that the Secretary's interpretation of "practicable" is consistent with the statutory purpose of protecting EFH while simultaneously giving the Secretary discretion to manage fishery resources.  *See* 16 U.S.C. § 1802(28)(A) (defining a fishery's OY as the amount of fish that "will provide the

---

[30/]  Oceana contends, however, that the Secretary's construction is inconsistent with the SFA's legislative history, because Congress intended to make EFH protection "a *required* element of fishery management plans."  (Oceana Reply at 7.)  *See City of Cleveland v. U.S. Nuclear Regulatory Comm'n*, 68 F.3d 1361, 1367 (D.C. Cir. 1995) (agency construction of statute must be consistent with statutory purpose and legislative history).  But Oceana's point is irrelevant, for the fact that EFH protection became a mandatory provision rather than a "discretionary provision" does not mean that the Secretary lacks discretion to balance numerous factors when considering EFH protection alternatives.  Rather, as even the sponsor of this latter measure conceded, "My amendment does one simple thing.  It simply requires the regional councils to include measures to minimize, *to the extent practicable*, fishing impact on fish habitat."  141 Cong. Rec. H10,224 (1995) (statement of Rep. Farr) (emphasis added).  *See also* H.R. Rep. No. 104-171, at 24 (1995) (incorporating practicability standard into SFA's EFH provisions).

greatest overall benefit to the Nation, particularly with respect to food production and

recreational opportunities, and taking into account the protection of marine ecosystems").   The

identification of what particular combination of alternatives protects EFH and therefore warrants

detailed consideration lies within the Secretary's "area of special expertise" and is entitled to

deference.  *Nat'l Fisheries Inst. v. Mosbacher*, 732 F. Supp. at 223.   Particularly in light of the

Secretary's reliance on the scientific findings of the NRC and the international experts who

participated in the Northeast U.S. Fishing Gear Effects Workshop, *see* 69 Fed. Reg. at 22,922

(*see also* A.R. 1438), the Court cannot fault the Secretary's choice of options for consideration,

and will not presume to substitute its own judgment for the Secretary's considerable expertise in

this area.  *See AOC*, 183 F. Supp. 2d at 11-12 ("Where the agency decision turns on issues

requiring the exercise of technical or scientific judgment, it is essential for judges to 'look at the

decision not as the chemist, biologist, or statistician that we are qualified neither by training nor

experience to be, but as a reviewing court exercising our narrowly defined duty of holding

agencies to certain minimal standards of rationality.'") (quoting *Ethyl Corp v. EPA*, 541 F.2d 1,

36 (D.C. Cir. 1976) (en banc)).

Moreover, in constructing a regulatory action governing fishing for 23 species in an area

covering hundreds of thousands of square nautical miles, virtually limitless alternatives could

theoretically be evaluated, but such an undertaking is not demanded by the rule of reason.  *See*

*Tongass*, 924 F.2d at 1140.  The Secretary properly identified the regulatory purpose, and

considered the impacts of his decision, including giving a "hard look" at a reasonable range of

practicable alternatives in light of that purpose.  This is all that NEPA demands.  *See NRDC v.*

*Hodel*, 865 F.2d 288, 294 (D.C. Cir. 1988).[31/]

## B.    Did Amendment 13 have to Designate New HAPCs?

Oceana also argues that Amendment 13 unlawfully failed to create any additional

HAPCs.  (Oceana Mot. at 34-36.)  But HAPCs are not even addressed by the SFA; rather, they

are a creature of the Secretary's regulations.  Functionally, HAPCs are a subset of EFH, and are

identified based on one or more of the following factors:

(i)    The importance of the ecological function provided by the habitat.
(ii)   The extent to which the habitat is sensitive to human-induced environmental degradation.
(iii)  Whether, and to what extent, development activities are, or will be, stressing the habitat type.
(iv)   The rarity of the habitat type.

50 C.F.R. § 600.815(a)(8).

The Secretary did not act arbitrarily in failing to designate HAPCs in Amendment 13,

because such designations are discretionary, not obligatory.  The HAPC regulation states that

they "should" be identified in FMPs, *id.*, but this term, as defined by the regulations, means that

HAPC designation was only "strongly recommended."  50 C.F.R. § 600.305(c)(3); *see also id.*

_____

[31/]   Oceana contends that the Secretary acted arbitrarily by deviating from his own regulation regarding EFH protection measures.  (Oceana Mot. at 32-34.)  Oceana reads the regulation as requiring three separate stages of analysis, with the purported first stage -- identification of a range of potential new actions that may be taken -- being distinct from the supposed second stage, when the practicability of such actions is weighed.  (Oceana Reply at 7-8.)  But the formalism Oceana ascribes to the regulation exists only when the relevant sentence is taken out of context.  *See* 50 C.F.R. § 600.815(a)(2)(ii) (FMP "should identify a range of potential new actions that could be taken to address adverse effects on EFH, include an analysis of the practicability of potential new actions, and adopt any new measures that are necessary and practicable").  Read correctly, the measure does not establish three distinct steps, but rather sets out a broad task that consists of evaluating and ultimately adopting a reasonable range of alternatives that are practicable.  Moreover, as with many aspects of the regulations governing the Council's production of an FMP, the section Oceana cites uses the term "should" and therefore merely amounts to the Secretary's "strong[] recommend[ation]," which is not binding.  *See* 50 C.F.R. § 600.305(c)(3) (defining should; *see also id.* § 600.810(b).

§ 600.810(b).  By contrast, numerous other components of FMPs "must" be included.  *See, e.g.*, 50 C.F.R. § 600.815(a)(1)(i) (FMPs must identify EFH); *id.* § 600.815(a)(1)(v) (FMPs must include maps of EFH); *id.* § 600.815(a)(1)(iv)(E) (where FMP groups species in designating EFH, the plan must include a justification and scientific rationale).  Amendment 13 did designate EFH, but did not establish new HAPCs, as permitted by the regulation.  In short, the Secretary (and the Council) did not act unlawfully by failing to consider additional HAPCs, because such consideration was not required by the MSA and was optional under the regulations.[32/]

Moreover, the Court rejects Oceana's contention that HAPCs were required by the *AOC* Joint Stipulation.  (Oceana Mot. at 34.)  The Joint Stipulation is silent on the question of HAPCs. It only required "consider[ation of] a range of reasonable alternatives for minimizing the adverse effects [on EFH]."  (A.R. 1331 at D-01-3105-06 ¶ 6.)  That the Director of the Fisheries Service in January 2001 recommended that HAPCs be considered in FMPs in order to comply with the *AOC* order does not mean that failure to consider them years later in Amendment 13 was arbitrary.  Indeed, as with the regulation described above, the Director stated only that HAPC alternatives "should" be discussed, whereas he made clear that other factors, such as "a reasonable range of alternatives for developing the mandatory EFH provisions of the affected FMPs," "must" be evaluated.  (A.R. 689 at D-01-215.)  Thus, while the Joint Stipulation required consideration of EFH options, HAPCs were not specified as a necessary option, and it was not required that defendants include them in Amendment 13.

---

[32/]  Although Amendment 13 did not establish any new HAPCs, one that had already been established to protect juvenile cod remains in a closed area under the new FMP, and it acquired new protections, including the banning of bottom-tending mobile gear.  *See* 69 Fed. Reg. at 22,923.  (*See also* A.R. 166 at C161-62.)

Moreover, the Secretary has not abandoned his discretionary efforts to establish HAPCs.

Rather, he has reasonably deferred them until after he is able to assess the results of Amendment

13 and its Atlantic sea scallop counterpart, Amendment 10.  Amendment 13 provides that the

forthcoming Essential Fish Habitat Omnibus Amendment 2, which will address numerous FMPs

covering species in Northeastern waters, will identify HAPCs, and the Council has established a

process for doing so.  *See* 69 Fed. Reg. at 22,923.  (*See also* A.R. 166 at C81-82.)

### III.    Bycatch Reporting Methodology

### A.    Background

Both Oceana and CLF challenge Amendment 13's provisions for monitoring bycatch.

They allege that the Amendment fails to comply with the MSA, as modified by the SFA, and that

it violates NEPA by failing to consider an adequate range of bycatch reporting methodology

alternatives.

The SFA added several new provisions to the MSA, including the requirement that FMPs

must:

> establish a standardized reporting methodology to assess the amount and type of
> bycatch occurring in the fishery, and include conservation and management
> measures that, to the extent practicable and in the following priority --
> > (A) minimize bycatch; and
> > (B) minimize the mortality of bycatch which cannot be avoided.

16 U.S.C. § 1853(a)(11).  Commercial fishers routinely discard as bycatch fish caught that were

"untargeted" or that would exceed the fishers' quota.  *See* 142 Cong. Rec. S10,810 (1996)

(statement of Sen. Stevens).  *See also NRDC v. Evans*, 168 F. Supp. 2d 1149, 1152 (N.D. Cal.

2001) (discussing bycatch mortality rates); *CLF I*, 209 F. Supp. 2d at 12 n.23 (recounting

legislative history supporting bycatch minimization, which Rep. Don Young called "one of the most crucial challenges facing fishery managers today").

In a ruling on Framework 33 and Amendment 9 (Amendment 13's FMP predecessors), Judge Kessler found that defendants had breached the SFA's bycatch provisions by failing to provide a reasoned basis for not adopting new measures, such as a dedicated observer program, to report and assess bycatch, as well as to minimize bycatch and bycatch mortality in the groundfish fishery. *CLF I*, 209 F. Supp. 2d at 13, 15.  Because the Secretary had plainly failed to respond to evidence of significant deficiencies in the existing reporting scheme and had been unreasonably dismissive of the alternative of an expanded observer program, the Court concluded that defendants had acted arbitrarily, capriciously and contrary to law in violation of the SFA and APA.  *Id*. at 13.

The bycatch reporting methodology preexisting at the time of *CLF I* consisted primarily of fishing boats' logbooks, also known as Vessel Trip Reports ("VTRs"), but as all appear to agree, they are notoriously inaccurate.  *Id.* at 13 & n.24-25.  The other measures -- a very limited observer program that canvassed less than one percent of the fishing effort and a "cooperative statistics program" that, three years after the deadline for its implementation, had yet to collect any bycatch data -- were also found to be inadequate.  *Id.* at 13 n.25.  Thus, the Court held that the Secretary had violated the SFA and his own regulations, which expressly require a "review" or "improvement" of bycatch reporting methodology.  *Id.* at 13 (citing 50 C.F.R. § 600.350(d)(1) and 16 U.S.C. § 1853(a)(11)).

To address these issues, the Court entered a Remedial Order, pursuant to a settlement agreement reached by the parties, requiring defendants to "provide 5% observer coverage, or

higher, if necessary to provide statistically reliable data.  Effective May 1, 2003, NMFS shall

provide 10% observer coverage for all gear sectors, unless it can establish by the most reliable

and current scientific information available that such increase is not necessary."  *CLF II*, 211

F. Supp. 2d at 58.  This Order, by its own terms, expired upon enactment of Amendment 13.  *Id.*

at 57.

On the date the ten percent coverage level was to take effect, the Secretary filed a notice

with the Court indicating that defendants had scientifically concluded that a five percent level

was sufficient.  Federal Defendants' Notice of Administrative Action, Ex. 1 at 3, *CLF v. Evans*,

No. 00-1134 (D.D.C. May 1, 2003).  Plaintiffs objected that the Secretary's scientific

justification was insufficient, because although it addressed the issue of the coverage level

required to achieve precise estimates of bycatch discards, it said nothing about whether those

estimates would actually be accurate.  Plaintiffs' Response to Federal Defendants' Notice of

Administrative Action at 1-2, *CLF v. Evans*, No. 00-1134 (D.D.C. June 4, 2003).

Notwithstanding the Secretary's notice to the Court, the Council in Amendment 13

endorsed a ten percent level of observer coverage.  The Amendment provides:  "The Council

desires 10 percent observer coverage for all gear sectors."  (A.R. 166 at C140; *see also* A.R. 166

at C197 (Council establishing 10% observer coverage level, but giving Secretary power to

deviate from this level if he establishes that such a level is not necessary).)  In the final rule as

promulgated, the Secretary did not specify a particular bycatch reporting methodology in any of

the twenty-three items labeled as "approved measures."  *See* 69 Fed. Reg. at 22908-16.  Without

explicitly mentioning bycatch, however, item fifteen -- "Reporting Requirements" -- does require

dealers to report daily "all fish purchases; the disposition of the landings; and a trip identifier,"

and it requires vessels, once an electronic system is developed, to report all the information

currently included in VTR reports, as well as a "password, a trip identifier, and landings

information by statistical area for each trip." *Id.* at 22913-14.  Later, in responding to public

comments that bycatch reporting should be set at at least 10%, the Secretary stated that "NMFS

intends to maintain its observer coverage in the groundfish fishery at a minimum level of 5

percent." *Id.* at 22932.  The Secretary noted that for fiscal year 2004, a 10% level was

implemented in response to a Congressional mandate, but a "5 percent level of observer coverage

will resume in FY 05 and beyond, absent a similar appropriation requiring a greater level of

observer coverage." *Id.*  In response to another comment contending that Amendment 13 lacked

a standardized bycatch reporting methodology, the Secretary again stated that "NMFS intends to

maintain its observer coverage in the groundfish fishery at no less than 5 percent." *Id.*

### B.      CLF's and Oceana's Claims

CLF contends that Amendment 13 does not establish a bycatch reporting methodology,

because it contains no mandatory provisions.  (CLF Mot. at 33-36 & n.21; CLF Reply at 28-30.)

CLF notes in particular that earlier reporting measures were wholly inadequate.  For instance, a

Council staffer reported that, according to fishermen's logbook data (VTRs), one of the chief

bycatch reporting methods, the New England groundfish fishery ranged from "Africa to Alaska,

with heavy fishing in the Vancouver and Chicago areas."  (A.R. 21 at A3799; *see also* A.R. 166

at C605.)  The Council also had previously concluded that "both VTRs and the limited observer

program are insufficient to estimate annual bycatch levels, because commercial fishers

unlawfully underreport bycatch in VTRs." *CLF I*, 209 F. Supp. 2d at 13 n.25.

Oceana's complaint is more particularized, arguing that Amendment 13 violates the SFA because it does not establish a mandatory level of observer coverage, but rather merely expresses an intention to implement certain coverage levels.  (*See* Oceana Mot. at 39.)  In plaintiff's view, the language of both Amendment 13 and the Secretary's responses to public comments makes clear that defendants do not consider themselves bound to provide any particular level of observer coverage.  Oceana submits that this approach violates both the mandatory language of the SFA, 16 U.S.C. § 1853(a) (providing that an FMP "*shall* . . . establish a standardized reporting methodology" to assess bycatch (emphasis added)), as well as the Secretary's own regulations, which provide that, as part of National Standard Nine, a review of data collection methods "must" be completed for each fishery as part of an FMP.  *See* 50 C.F.R. § 600.350(d)(1); *see also* 63 Fed. Reg. at 24,213 (explaining defendants' change of word "should" to "must" "in order to reflect the required provisions of a fishery management plan").

### C.   Do Amendment 13's Bycatch Measures Comport With the MSA?

As already noted, Amendment 13 contains among its "approved measures" no specific mention of bycatch reporting.  And in responding to comments, the Secretary stated that he merely "intends" to maintain a 5% coverage level.  While he did state that a 5% level "will resume in FY 05 and beyond," in the context of the Secretary's overall response to criticisms of Amendment 13's bycatch reporting, it is clear that this figure is not mandatory and may be subject to change if the Secretary deems it proper.  *See* 69 Fed. Reg. at 22,932 (discussing the Secretary's statistical findings in support of a lower level of coverage than had been endorsed by the Council, and stating that the Secretary only "intends" to maintain a 5% coverage level).  The Council's language in Amendment 13 is similarly ambiguous.  (*See* A.R. 166 at C140 (stating

only the Council's "desire" for 10% coverage); *id.* at C197 (granting the Secretary authority to deviate from the 10% level if he finds, based upon a scientific analysis, that such a level is "not necessary").)  These citations make clear that Amendment 13 does not contain a mandatory level of observer coverage, and more generally, it does not contain any new bycatch reporting methodology.  *Cf. NRDC v. Daley*, 209 F.3d at 755 (rejecting a voluntary FMP provision where, to achieve the results the Secretary predicted, a mandatory one was required).

Defendants nonetheless argue that Amendment 13 sets forth a variety of measures, such as a limited observer program and ships' logbooks, that already are used to monitor bycatch. (*See* A.R. 167 at C1472; *see also* Defs.' Opp'n at 102, 105-108.)  However, a description of past practices already found deficient by a court does not constitute the "establish[ment]" of a bycatch reporting methodology.  *See* 16 U.S.C. § 1853(a)(11).

Indeed, there is no dispute that, given the inadequacy of other reporting methods, live observers are an essential component of an adequate bycatch reporting methodology.  Defendants have concluded that "[n]on-biased observer data collection in the majority of instances is the most effective way to monitor bycatch," and that "[o]bservers provide the most reliable source of high quality, objective, fishery-dependent data."  68 Fed. Reg. at 11,505, 11,509.  Therefore, "[f]or fisheries where observer coverage is needed to monitor bycatch . . . a level of coverage should be deployed that provides statistically reliable bycatch estimates."  *Id.* at 11,504.[33]  In light of defendants' own findings, as well as the Court's reasoning in *CLF I*, it was clear that a "methodology" that simply retained the status quo was unacceptable.  Thus, insofar as Amendment 13's language indicates only an "intent" to implement an adequate program, it fails

---

[33]  In the New England groundfish fishery in 2003, it cost $1150 for a trained bycatch observer to monitor a single vessel for a single day.  (A.R. 3528 at D-03-6800.)

to comply with governing law, because defendants' intent could change at any time. "Because

the observer program is optional under Amendment 13, NMFS in theory could decide not to

implement an observer program for the ground fishery, and nothing in Amendment 13 would

prohibit the agency from making that decision." *Pac. Marine Conservation Council, Inc. v.*

*Evans*, 200 F. Supp. 2d 1194, 1200 (N.D. Cal. 2002) (deeming unlawful an FMP that failed to

mandate in the FMP itself a bycatch assessment methodology); *accord CLF I*, 209 F. Supp. 2d at

13. By its very terms, an FMP that merely suggests a hoped-for result, as opposed to

"establish[ing]" a particular standardized methodology, does not measure up to the statute's

requirements. *See* 16 U.S.C. § 1853(a)(11).

 In response, defendants contend that Amendment 13 need not include a mandatory level

of observer coverage as part of a bycatch monitoring program, because the Council, which

authored the Amendment, does not manage the observer program (*see* 69 Fed. Reg. at 22,932)

and because the Secretary can implement such measures administratively through regulations.

(*Id.*; Defs.' Opp'n at 107.) While it is true that the Secretary has the power and responsibility to

promulgate regulations to implement the terms of FMPs, *see* 16 U.S.C. § 1853(c); *id.* § 1855(d),

defendants' argument that a *mandatory* provision of an FMP may be created by the Secretary

acting alone outside the context of the Amendment process defies the plain language of the

MSA. The statute makes perfectly clear that the "establish[ment] of a standardized [bycatch]

reporting methodology" is a "required provision" of "any fishery management *plan* which is

prepared by any Council." *Id.* § 1853(a) (emphasis added). In short, bycatch reporting

methodology is discussed in the subsection describing mandatory plan contents, not in the

separate subsection discussing Secretarial regulations implementing such plans.  *Compare id.*
§ 1853(c) (describing proposed regulations).

Moreover, the Secretary's contention that Amendment 13's lack of a specified level of
observer coverage is explained by the fact that the Council does not manage the observer
program is likewise groundless.  69 Fed. Reg. at 22,932.  (*See also* Defs.' Opp'n at 107.)  The
MSA requires that Amendment 13 establish the reporting methodology.  *See* 16 U.S.C.
§ 1853(a)(11).  There is no reason why the Council cannot fulfill its statutory duty to establish
the reporting methodology for a monitoring program, even if it is not responsible for managing
this program.

Defendants also contend that the Secretary complied with the Council's directive by, in
lieu of implementing a 10% coverage level, establishing "by the most reliable and current
scientific information that [a 10% coverage level] is not necessary to achieve an acceptable level
of precision and accuracy."  (A.R. 166 at C197.)  NMFS scientists conducted a study that
determined that 5% coverage was sufficient.  (*See* A.R. 2760 at D-03-1451.)  However, this
conclusion was based only on the goal of achieving a precise estimate of bycatch, rather than one
that is both precise *and* accurate.  (*See id.* at D-03-1453.)  As one of the study's co-authors
admitted, "The accuracy issue should be avoided.  We can't address that with the data we have
and I'm not aware of anyone who has done this.  Drawing attention to the accuracy issue would
only cloud the question of sample size needs in my view."  (A.R. SPP 34 at 1.)[34]

---

[34]   There are two sources of error in discard estimates generated by observer programs:
"accuracy, which measures how close the expected value of the estimate is to the actual value,
and precision, which measures how close a series of independent estimates are to each other."
(A.R. 3752 at D-04-628.)  Ideally, a sampling program should produce estimates that are *both*
accurate and precise.

In light of the NMFS Regional Administrator's contention that "the accuracy of the [bycatch] estimates may be impossible to assess" (A.R. 3098 at D-03-4388), Oceana commissioned its own study (referred to as the "Babcock Study"). It explained the problem of bias, which affects the accuracy of the observers' estimates, because their bycatch figures -- while precise -- often fail to account for "changes in fishermen's behavior in the presence of observers" and for selection bias, in that many observers travel on vessels that *volunteer* to carry them. (A.R. 3752 at D-04-626.) In other words, "[t]he accuracy of an estimate depends on these three measurements [necessary for achieving a precise estimate: the size of the sample, the size of the fishery, and the variability of the bycatch]," *plus* one additional consideration: "whether the sampled part of the fishery is representative of the entire fishery." (*Id.* at D-04-629.) The scientists hired by Oceana purported to do what defendants claimed could not be done: design a program that would be *both* precise and accurate. They determined that for rare bycatch species, coverage should be set at a 50% level, and for common bycatch species, 20% would suffice. (*Id.* at D-04-643.) Oceana submitted this study to the Secretary in conjunction with the notice and comment process for Amendment 13, contending that the Amendment must be revised in light of this evidence. (*Id.* at D-04-619-20.)

Defendants responded to Oceana's comment by arguing that their earlier study provided an adequate basis for determining that 5% coverage was sufficient to achieve a "precis[e]" discard estimate. 69 Fed. Reg. at 22,932. They did not, however, respond to plaintiff's argument that the Secretary's analysis focused on precision to the exclusion of accuracy, notwithstanding Oceana's contention that the Babcock Study constituted the "best available science" and considered both factors. (*Id.* at D-04-619-20.)

In light of the Secretary's failure to adequately respond to Oceana's study, notwithstanding his duty to formulate FMPs, including a required bycatch reporting methodology, according to the "best scientific information available," 16 U.S.C. § 1851(a)(2), the Secretary's "inten[tion]" to adopt a 5% observer coverage is arbitrary and capricious in violation of the MSA and APA.  16 U.S.C. § 1853(a)(11); *see* 5 U.S.C. § 706(2)(A).  *See also NRDC v. Daley*, 209 F.3d at 755-56 (quoting *Motor Vehicle Mfrs. Ass'n, Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 48 (1983) and *A.L. Pharma, Inc. v. Shalala*, 62 F.3d 1484, 1491 (D.C. Cir. 1995)) (holding that agency scientific determinations are not entitled to deference where they fail to "cogently explain" how the resultant recommendations satisfy the MSA's requirements).

As to CLF's more general contention that Amendment 13 fails to spell out a standardized bycatch reporting methodology, plaintiffs' point is well taken.  They argue that, in addition to evaluating an adequate observer program, an FMP must include "an analysis, effectively sector by sector throughout the fishery by different gear types and different species, of what the combination of methods should be in order to effectively put in place a standardized bycatch reporting methodology."  (Hearing Transcript at 113; *see also* CLF Mot. at 36.)  As an example, plaintiffs point to the bycatch reporting methodology used in the Pacific highly migratory species ("HMS") fishery, which evaluates various kinds of reporting for different types of fishing gear and vessels.  (*See* CLF Mot. Ex. 2 (HMS FMP, August 2003) at Ch. 5, pp. 34-36.)  The government argues that Amendment 13 in fact includes many of the same analyses used in the Pacific FMP (Defs.' Opp'n at 102), but plaintiffs reply that these "isolated snippets" (CLF Reply

at 30) found throughout Amendment 13's nearly eighteen hundred pages do not constitute a reporting program, nor has the Secretary suggested as much prior to the instant litigation.

The Court agrees with this latter point, and rejects what appears to be a *post hoc* rationalization.  An agency must "give clear indication that it has exercised the discretion with which Congress has empowered it," and "[t]he courts may not accept . . . counsel's *post hoc* rationalizations for agency action."  *Burlington Truck Lines*, 371 U.S. 156, 168 (1962) (internal citations and quotation marks omitted).  The record does not show that the Secretary deemed these measures to be part of a standardized bycatch reporting methodology, and therefore, the Court must reject the Secretary's attempt at this late date to characterize them as such.

Moreover, without more thorough analyses and coherent justifications, the program components now cited by the Secretary do not meet the MSA's requirement that he review the bycatch reporting methodologies and, if necessary, adopt new ones, *see* 16 U.S.C. § 1853(a)(11); *id.* § 1851(a)(9), especially in light of Judge Kessler's prior finding that such measures, including often inaccurate VTRs, a non-mandatory observer program, and NMFS' limited data processing capacity, are seriously flawed.  *See CLF I*, 209 F. Supp. 2d at 13 & n.24-27.  (*See also* Defs.' Opp'n at 102 (citing "program" components previously found wanting by the court, without providing record evidence to substantiate how these methods pass muster now when, as the government conceded in *CLF I*, they were deficient three years ago).)

In sum, Amendment 13 does not meet the SFA's requirements because it fails to fully evaluate reporting methodologies to assess bycatch, *id.* § 1853(a)(11); it does not mandate a "standardized reporting methodology," *id.* § 1853(a)(11), and it fails to respond to potentially important scientific evidence.  *Id.* § 1851(a)(2).  Accordingly, the Court concludes that the

bycatch monitoring provisions of Amendment 13 do not satisfy the SFA, and plaintiffs' motions

for summary judgment with respect to this claim are granted.[35/]  *See* 5 U.S.C. §706(2)(A).

**CONCLUSION**

Amendment 13 reflects the Council's and the Secretary's painstaking efforts to achieve a

delicate balance that rebuilds stocks and ends overfishing while allowing fishermen to continue

fishing those stocks that are healthy.  Given the complexity of this task, the Court must conclude

that Amendment 13 is, with limited exception, reasonable and in accordance with law.

Accordingly, summary judgment is granted in favor of defendants, except as to Amendment 13's

bycatch monitoring provisions and 50 C.F.R. § 648.85(a)(2)(i)(D).  With respect to this latter

regulation, the Court grants Count Seven of TSF's Complaint and vacates the third sentence of

50 C.F.R. § 648.85(a)(2)(i)(D).  With respect to plaintiffs CLF's and Oceana's bycatch claims,

the Court finds that Amendment 13 violates the bycatch provisions of the SFA, and therefore,

this aspect of Amendment 13 is remanded to the Secretary for further action consistent with this

Memorandum Opinion.[36/]

---

[35/]  Given this resolution of plaintiffs' claims under the MSA and the APA, the Court need not reach their NEPA claims, *see NRDC v. Daley*, 209 F.3d at 753, which raise the novel question of whether the establishment of a bycatch reporting methodology is a "proposed action," 42 U.S.C. § 4322(2)(C)(iii), that warrants a full NEPA analysis of alternatives.

[36/]  The only part of Amendment 13 remanded to the Secretary concerns the bycatch reporting methodology.  Since this provision is severable from the balance of the Amendment, no purpose would be served by vacating other parts of the FMP, and such an approach would be unnecessarily disruptive.  *A.L. Pharma, Inc. v. Shalala*, 62 F.3d 1482, 1492 (D.C. Cir. 1995).

_____s/_____
ELLEN SEGAL HUVELLE
United States District Judge

Date:   March 9, 2005